Filed 11/18/15  P. v. Moreno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDGAR ANTONIO MORENO,<br><br>    Defendant and Appellant. | F068014<br><br>(Kings Super. Ct. No. 12CM8517)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tarter, Judge.

Julia Freis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant pled no contest to a residential burglary charge and was placed on probation. Defendant had also been charged with several crimes for allegedly raping the victim, but all charges beyond the residential burglary were dropped after two mistrials.

After a probation revocation hearing, defendant was found to have violated his probation months later by sexually assaulting a different woman. The court sentenced defendant to an aggravated term of six years, despite having apparently given an indicated sentence of four years before the probation revocation hearing.

Defendant contends (1) there is insufficient evidence he violated probation, (2) the court considered improper matters in imposing an aggravated sentence, and (3) that a traffic infraction conviction in a separate case was improper. We will reject the first two contentions and decline to consider the third. We affirm the judgment.

# BACKGROUND

On September 7, 2012, defendant was charged with residential burglary (Pen. Code, § 459),[1] assault with intent to commit rape (§ 220, subd. (a)), sexual penetration by force (§ 289, subd. (a)(1)), kidnapping to commit rape (§ 209, subd. (b)(1)), two counts of attempted oral copulation (§§ 664/288a, subd. (c)(2)), forcible sexual intercourse (§ 261, subd. (a)(2)), and false imprisonment (§ 236) in a first amended information. The information also alleged that defendant committed forcible sexual intercourse during the commission of a first degree burglary, and kidnapped the victim substantially increasing the risk of harm to her.[2] (§§ 667.61, subds. (a), (d).) These alleged crimes concerned victim, J.E.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] The charges outlined above were contained in a first amended information, which was filed after the first of two mistrials.

2.

On September 10, 2012, after two mistrials,[3] defendant pled no contest to the residential burglary charge, and the remaining charges and allegations were dismissed. On October 16, 2012, defendant was placed on probation for three years. One of the terms of defendant's probation was that he "[o]bey all laws."

On February 4, 2013, the government requested a hearing claiming that defendant had violated his probation by sexually battering a woman named M.A.[4] on or about January 27, 2013. Defendant was also separately charged with sexual battery for the same conduct in a misdemeanor complaint. (§ 243.4)

The misdemeanor complaint and the violation of probation allegation were heard simultaneously before a judge and jury in July 2013. Thereafter, the jury acquitted defendant of sexual battery, but the trial court found that defendant had in fact committed the sexual battery. Consequently, the court terminated probation and sentenced defendant to a prison term of six years.

After the court remanded defendant to the custody of the sheriff, it noted that defendant "has a traffic case, and that's case number A159064, and that is for, looks like failure to stop in violation of Vehicle Code Section 22450 as an infraction." Defendant pled no contest and the court imposed several fines.

---

[3] The mistrials occurred in December 2011 and September 2012.

[4] M.A. was an adult at the time of the incident, but her first name is arguably uncommon so we have chosen to suppress it for privacy reasons.

## FACTS

Defendant mounts a substantial evidence challenge against the trial court's finding that he violated his probation by sexually assaulting M.A. in 2013. Therefore, the following facts are taken from the probation revocation hearing (i.e., the hearing at which the allegedly insufficient evidence was adduced).

Evidence concerning the J.E. incident was also admitted at the probation revocation hearing as propensity evidence. Because the ultimate factual issue at the probation revocation hearing was whether defendant sexually assaulted M.A., we begin with the evidence concerning that incident and then proceed to describe the propensity evidence concerning the earlier J.E. incident.

*A. M.A.*

On January 27, 2013, M.A. went to a small party in Avenal at the home of someone named Javier. Not many people were there, but everyone was drinking.

Defendant, whom M.A. had met on approximately two prior occasions, was also there at some point. M.A. "may have said hi" to defendant but otherwise did not interact with him at the party.

Between 11:00 p.m. and 3:00 a.m., M.A. drank three glasses of wine. She began to feel intoxicated and tired, so she left the house and went to her car around 3:00 a.m. She asked another partygoer, Daniel,[5] to come with her to the car, which was across the street from the party. M.A. sat in the front passenger seat, and Daniel sat in the driver's seat. She closed her eyes and drifted in and out of sleep.

About 10 minutes later, M.A. heard the car door open. She was awakened by the feeling of someone's hand caressing her vagina for four to five seconds. The person also kissed her, forcing his tongue into her mouth. She opened her eyes and saw defendant.

---

[5] We refer to the other partygoers by their first names to "give them some limited measure of privacy …." (*Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1251, fn. 1.)

She was startled, and defendant was scared. Defendant "backed off." M.A. yelled, "[W]hat the f[**]k?" No one else was in the car.

M.A. began crying hysterically. Defendant got out of the car and went in the opposite direction of the party. Two to five minutes later, M.A. saw defendant's brother, Antonio Moreno, run in the same direction defendant had gone. M.A. went back to the party where Daniel and two other partygoers, Hailey and Mariah, approached her. M.A. told Hailey and Daniel what had happened. After she told them about the incident, nobody "ma[de] it an issue" (i.e., no one tried to figure out where defendant went), so M.A. called her boyfriend, Steve.

M.A. told Steve what had happened, and he came to pick her up. He wanted to confront defendant, so he and M.A. went to defendant's house. The confrontation lasted "maybe" 15 or 20 minutes and there was "a lot of arguing."[6]

M.A. was embarrassed and did not immediately call the police. After the incident, Hailey and Steve told M.A. about a "previous case" involving defendant. She eventually called the police a couple days after the incident.

M.A. had never given defendant permission to touch her.

*B. Steve's Testimony*

Steve testified that M.A. called him after midnight early one morning in January. Initially, he could not understand M.A. because she was crying. Eventually, she told him that she was asleep in her car and woke up with defendant on top of her.

Steve headed toward Avenal and called defendant. Steve said, "[W]hat the f[**]k is your problem?" Defendant said, "[W]hat are you talking about, bro[?]" Steve told defendant he knew what Steve was talking about. Defendant told Steve to "come over

---

[6] This quotation concerning arguing was taken from the question posed by counsel to which M.A. responded affirmatively.

here and let me tell you what really happened." Defendant told Steve that he "wasn't the first one in the car."

### C. Hailey

Hailey attended the party at Javier's house in January. Sometime after midnight M.A. came inside the house crying. She told Hailey that "Tony's brother" had "tried, like, kissing her and he tried touching her."

### D. Daniel

Daniel testified that he walked M.A. to her car sometime after midnight. Daniel sat in the driver's seat, and she sat in the passenger seat while Daniel spoke with two other people standing outside the car. After about five or 10 minutes, M.A. was asleep. At that point, Mariah left the party upset, so Daniel and one of the people he had been talking to left to follow her. Daniel left the driver's door open.

After a matter of minutes, Daniel returned and found M.A. still in the car. She was "concerned" and said that defendant had touched her. Daniel "didn't really pay much attention" to M.A.'s comment because "she had drank, so I wasn't really sure."

### E. Mariah

Mariah also attended the party at Javier's house. Mariah did not see M.A. walk to her vehicle and never saw her inside her vehicle. Mariah testified she did leave the party, but she did not recall being upset or seeing anyone following her.

### F. Antonio Moreno

Defendant's brother, Antonio Moreno (Antonio),[7] testified that he attended the party at Javier's house. Antonio spoke with defendant at the party. Defendant told Antonio he was leaving and left the party between 2:00 and 2:30 a.m. Forty-five minutes after defendant said he was leaving, Antonio first saw signs that M.A. was distraught.

---

[7] Since he shares a last name with the defendant, we refer to Antonio Moreno as "Antonio." No disrespect is intended.

Antonio overheard M.A. telling her friends that defendant had tried to kiss her in the car. She was "really emotional." Antonio did not hear her say anything about defendant trying to touch her "private parts."**8**

Antonio testified that Steve was his best friend. Steve called Antonio and said he was going to "beat up" defendant at Antonio's house. Antonio ran home and called defendant. Steve came to the house and confronted defendant aggressively. Several other partygoers had also come to Antonio's house.

*G. Defendant*

Defendant testified that he went to Javier's party around 1:30 a.m. He did not drink and left around 2:30 a.m. About three to five minutes before he left, defendant observed Daniel walk outside. Defendant went home, worked on homework and then went to sleep around 3:45 a.m.

Defendant was awakened at about 4:00 a.m. by a call from his brother, Antonio. Antonio told him that M.A. had said defendant kissed her. Then Steve called and asked "what the f[**]k was wrong with" him. Defendant said he did not know what Steve was talking about. When defendant eventually tried to explain himself, Steve just threatened him with physical violence.

Antonio eventually arrived home and spoke with defendant. About 10 minutes later, M.A. and Steve arrived at defendant's house. Steve rushed toward defendant, but Antonio got between the two. Defendant tried to talk, but Steve would not let him. M.A. ran up to defendant and hit him in the face.

At one point during the encounter at defendant's house, Daniel told Steve that he never saw defendant around the car. Steve said he did not believe Daniel.

---

**8** This quotation is from counsel's question.

*H. Propensity Evidence: J.E.'s Testimony*

The prosecution also called J.E. concerning the January 2011 incident from which defendant's burglary conviction arose.

In January 2011, J. was living in Avenal. One day, around 6:00 or 7:00 p.m., defendant was walking by J.'s house and asked for her son, N. She told defendant to "hang on" because she was getting groceries out of her car. Defendant returned a "little bit later" and knocked on the door asking for N. J. told him N. was in the shower.

Later that night, J. fell asleep on her couch. She was awakened and felt someone on top of her, pulling down her pajama pants. She struggled, grabbed her pants, trying to pull them up and yelled for the person to stop. She felt scared and was hysterical.

J. then felt something "trying to [be] insert[ed] into my rectum." She did not know whether it was an object, a penis, or fingers. She was screaming for her son.

J. was eventually able to get up on the edge of the couch and sit up. Defendant had his faced covered and was standing in front of her, holding her head. Defendant pulled her face toward his groin and told her to "suck it." She tried to bite defendant on his thigh. Defendant struck her in the face, causing a "big ringing" in her ear.

Defendant dragged J. by her hair down the hall to her bedroom. Defendant threw her on the bed, pulled her head down toward his penis and told her to "suck it." Defendant pulled off her pants and underwear and began having sexual intercourse with her. The intercourse was not consensual. The intercourse was painful for her, and she was crying, asking him to stop.

At one point during intercourse, defendant began licking J.'s neck. When that happened, defendant's face was no longer obstructed, and she was able to see that it was defendant. After defendant ejaculated on her bed, he told J. not to look at him and left. Shortly thereafter, J. moved to her mother's house and never returned.

8.

## I. *Defendant's Testimony*

### 1. Direct Examination

Defendant testified that around 11:30 p.m. on the night in question, he was walking down the street. J. was outside smoking a cigarette in her driveway. She asked defendant where her son, N., was. Defendant said he thought N. was at a party. J. then asked defendant if he could "give [her] a hand inside of the house."

Defendant followed J. into her house. Defendant could tell by "the way she was talking [that] she was drunk." Defendant also "believe[s]" he saw a bottle of wine on the table. J. called defendant toward her and he kissed her. She did not seem frightened, did not scream, and did not tell him to stop. J. then led defendant to her bedroom. She got onto the bed, and defendant "believe[s]" she unzipped his pants. The two then had consensual vaginal intercourse. J. made "moaning" sounds during intercourse, and did not scream. "Toward the end" she said, "[F**k] Nick." Defendant said it "started to seem awkward."

After defendant ejaculated, he told J. he was leaving. Defendant "believe[s]" she then asked where he was going. Defendant said he was going home, and she responded that if he left, she would tell the cops that he had raped her. Defendant "got scared" and walked out. She tried to grab him as he left the bedroom. Defendant reacted by telling her to "back up" and swinging his elbow. Defendant "didn't know how close she was and it hit her in the face, I believe, because I felt something. But she never said ow or nothing. I just walked out and she followed behind me."

When defendant first spoke to police officers after the intercourse, he made up a story. Police officers spoke to defendant a second time and, again, he made up a story. Defendant said he lied because he was scared of J.'s threat. Defendant was also embarrassed at the potential of his own mother and N. learning about the incident. Defendant claims he finally told the truth in his third statement, after an hour or two with law enforcement.

Defendant testified he did not have anything covering his face during the encounter. Defendant acknowledged that he had been convicted of a felony burglary occurring on January 27, 2011.

### 2. Cross-Examination

Defendant admitted on cross-examination that he had a girlfriend at the time of the incident.

Defendant admitted that he knew he went into J.'s house wearing a specific jersey and left without it.[9] Defendant also admitted lying to police officers afterwards by falsely recounting that he had been accosted that night by four or five unidentified persons who eventually left with his jersey. Defendant lied because he was scared the presence of his jersey in J.'s home could implicate him in a crime.

One of the officers told defendant there was semen located at the scene of the crime. Defendant admitted that he lied to the officer in response by saying the DNA would not match his.

## **DISCUSSION**

### I. SUBSTANIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDING THAT DEFENDANT VIOLATED PROBATION

Defendant contends there was insufficient evidence to support the trial court's finding that he had violated his probation.

#### A. *Law*

Probation may be revoked when a trial court "in its judgment, has reason to believe … that the person has violated any of the conditions of his or her supervision … or has subsequently committed other offenses, regardless whether he or she has been prosecuted for such offenses." (§ 1203.2, subd. (a).) The "facts in a probation revocation

---

[9] In the second mistrial, J. testified that a white jersey was found in her hallway after the incident. N. identified the jersey as belonging to defendant.

10.

hearing [are] provable by a preponderance of the evidence." (*People v. Rodriguez* (1990) 51 Cal.3d 437, 441.)

"We review a probation revocation decision pursuant to the substantial evidence standard of review [citation], and great deference is accorded the trial court's decision, bearing in mind that '[p]robation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court. [Citations.]' [Citation.]" (*People v. Urke* (2011) 197 Cal.App.4th 766, 773.)

1.  Analysis

Defendant concedes that M.A.'s own testimony constitutes evidence he committed the sexual battery, but argues that her level of intoxication, lack of corroborating evidence and contrary witness testimony rendered her testimony insufficient.

But even if the state of the evidence were as defendant describes it, the standard of review renders his argument a non sequitur. " ' "To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." [Citations.]' " (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728–729.) The court was fully apprised of the evidence concerning M.A.'s drinking at the party and nonetheless chose to largely accept her account. We may not second guess the trial court on that decision.

Defendant outlines other evidence that, in his view, contradicts M.A.'s testimony. For example, defendant contends that certain testimony indicated that he was only at the party from 1:00 a.m. or 1:30 a.m. until 2:30 a.m.,[10] yet one witness said M.A. came inside the party crying at 4:00 a.m.[11] Again, all these arguments are foreclosed by the

---

[10] To support the claim he left at 2:30 a.m., defendant cites only his own testimony and that of his brother. He then argues that no witness contradicted this claim.

[11] The witness actually testified: "Maybe four [a.m.] I really don't know. I wasn't keeping track of time."

standard of review. In order for us to reject testimony accepted by the trial court, the testimony "must be improbable ' "on its face" ' [citation], and thus we do not compare it to other evidence .… The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened? [Citation.]" (*People v. Ennis*, *supra*, 190 Cal.App.4th at p. 729, italics in original.) M.A.'s account is not impossible nor is it clearly false on its face. Our inquiry ends there.[12]

### B. *There is No Basis to Overturn the Lower Court's Sentencing Decision*

1. <u>Background Facts and Defendant's Contention</u>

Defendant next challenges his sentence, arguing the court improperly imposed an aggravated term of six years when it had given an indicated a sentence of four years before the probation revocation hearing started.[13]

When imposing the aggravated sentence, the court identified several factors in aggravation: Defendant's crime was violent, indicating a serious danger to society; his prior convictions and juvenile adjudications were numerous and increasing in seriousness; he was on probation when he committed the crime; and his prior performance on probation was unsatisfactory. Defendant contends that the court did not

---

[12] Defendant contends the propensity evidence concerning his alleged rape of J. is inadmissible notwithstanding Evidence Code section 1108. However, defendant does not contend that the trial court improperly considered the propensity evidence. Defendant raises the issue only in support of his claim that we should not consider the propensity evidence in determining whether substantial evidence supports the trial court's finding.

We need not address defendant's contention concerning Evidence Code section 1108 because we conclude that M.A.'s testimony alone, without the propensity evidence, was sufficient. In other words, even if we agreed with defendant's contention concerning Evidence Code section 1108 and refused to consider the propensity evidence on appeal, we would nonetheless conclude that the trial court's finding was supported by substantial evidence.

[13] The only record citation defendant provides for the court's indicated sentence of four years is his own sentencing memorandum. However, the Attorney General does not dispute that the trial court had, in fact, given a four-year indicated sentence as recounted by defendant.

actually rely on these factors but instead had improperly considered defendant's exercise of his right to a trial or some of the testimony at the probation revocation hearing.

### a. *Law Concerning Improper Sentencing Considerations*

When sentencing a defendant on revocation of his probation, "[t]he length of the sentence must be based on circumstances existing at the time probation was granted, and subsequent events may not be considered in selecting the base term.…" (Cal. Rules of Court, rule 4.435 (b)(1).) As a result, the court was precluded in this case from considering the incident involving M.A. in determining defendant's sentence for the burglary conviction arising from the incident involving J..

Additionally, a sentencing court may not punish a defendant more severely merely because he exercised his right to a trial. (*People v. Superior Court* (*Felmann*) (1976) 59 Cal.App.3d 270, 276.) However, this rule is not violated every time a defendant is subjected to a harsher sentence after declining to plead guilty pretrial pursuant to an indicated sentence. While a court may not sentence a defendant more harshly *because* he exercised his right to a trial; a court may nonetheless sentence a defendant more harshly *after* he exercises his right to a trial so long as the enhanced sentence is not imposed *as a result of* defendant's choice to go to trial. (See *In re Lewallen* (1979) 23 Cal.3d 274, 281 ["under appropriate circumstances a defendant may receive a more severe sentence following trial than he would have received had he pleaded guilty; the trial itself may reveal more adverse information about him than was previously known"].) In other words, chronology is not determinative of causation.

### b. *Defendant Has Failed to "Clearly Show" the Sentencing Court Relied on Improper Considerations*

Defendant contends that the court must have improperly considered his choice to go to trial because "[t]he only thing that had changed between when the trial court indicated a sentence of 4 years and when the trial court imposed a sentence of 6 years

was that [defendant] had gone to trial and been acquitted of the sexual battery charge." But that is not the only new information the court received after giving the indicated sentence before the probation revocation hearing started. J. herself addressed the court at the sentencing hearing on August 8, 2013. She said that the night defendant raped her, he took her pride and safety away from her. As a result, she felt she had to move away from her childhood home, which had been in her family for more than 35 years.[14] J. said she hoped the court would give defendant "the maximum sentence possible." The court was required to consider J.'s statements in imposing defendant's sentence (§ 1191.1), and we assume it did so. (Evid. Code, § 664.)

In sum, there are two possible inferences to be drawn from the record: Either the (1) sentence of six years was impermissibly based on defendant's choice to go to trial and/or his conduct after probation was imposed, or (2) the sentence was based solely on permissible considerations. " 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives.…' [Citation.]" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977–978.) Defendant has not "clearly shown" the sentencing court relied on improper considerations, rather than proper ones such as J.'s statement at the sentencing hearing. Instead, defendant has merely pointed to one of several inferences concerning the trial court's motivation in imposing an aggravated sentence. This is insufficient to carry his "clear showing" burden, and we will presume the trial court imposed his sentence in accordance with "legitimate sentencing objectives." (*Ibid.*)

---

[14] The sentencing court also received a probation report prepared dated August 3, 2013. The report contained new information, including defendant's post-hearing statement to the probation officer, and letters from friends and family. In two of those letters, defendant's mother and aunt each separately refer to the allegations against defendant as a lie.

14.

2. We Do Not Consider Defendant's Arguments Concerning his Conviction in Case No. A159064

In his briefing, defendant also challenges his conviction in case No. A159064 apparently concerning a Vehicle Code infraction. However, the record shows no timely notice of appeal filed in that case.[15] We therefore will not review that conviction from a separate case in this appeal.

### DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
HILL, P.J.


_____
FRANSON, J.

---

[15] In a separate order dated September 24, 2014, this court denied defendant's request to deem his notice of appeal in case No. 12CM8517 to be a constructive notice of appeal in case No. A159064.

15.