Filed 4/21/16  P. v. Yescas CA2/6
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAUL ANTONIO YESCAS, III,<br><br>    Defendant and Appellant. | 2d Crim. No. B262378<br>(Super. Ct. No. 1426760)<br>(Santa Barbara County) |

Raul Antonio Yescas, III, appeals from the judgment entered after a jury convicted him of two counts of forcible rape.  (Pen. Code, § 261, subd. (a)(2).)[1]  The jury found true a multiple-victim allegation.  (§ 667.61, subds. (b), (c)(1), (e)(4).)  The court imposed an aggregate sentence of 30 years to life, consisting of two consecutive 15-year-to-life terms.  It ordered appellant to pay a fine of $1,350 pursuant to section 290.3.

Appellant contends that the trial court erred in (1) admitting evidence of uncharged sexual offenses, (2) instructing the jury, and (3) denying his motion for a new trial.  The motion was based on newly discovered evidence and an alleged *Brady* violation.  (*Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215].)  Finally, appellant contends that the trial court erroneously imposed a fine of $1,350 pursuant to section 290.3.

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

Only the final contention has merit. We remand the matter with directions to impose an $800 fine pursuant to section 290.3 plus any required assessments, penalties, or surcharges. We also require the trial court to amend the abstract of judgment. In all other respects, we affirm.

*Facts*

*Rape of Jessica R.*

In April 2011 Jessica R. was 19 years old. She lived in Los Angeles and was visiting Santa Barbara. At the end of her visit, she intended to take the train back to Los Angeles. She got on a bus that was headed in the direction of the Santa Barbara Amtrak train station.

Appellant was a passenger on the same bus. Before the bus ride, appellant and Jessica R. were total strangers. They conversed with each other during the ride. To Jessica R., appellant "seemed like a sweet, nice guy." She got off the bus to transfer to another bus, but appellant said that the Amtrak station was only a short walk away. He offered to walk there with her and carry her suitcase. Jessica R. accepted the offer.

On the way to the station, Jessica R. said she had to urinate. Appellant led her to a women's restroom. She went inside while appellant waited outside with her suitcase and purse. The restroom was empty. Jessica R. entered a stall, pulled down her pants, and sat down on the toilet. She heard someone enter the restroom. It was appellant. He "came in [to the stall] with his pants already down to his ankles with [an erection] ready to go." Jessica R. said, "What the fuck are you doing?" Appellant did not respond. He grabbed her from behind and pushed her towards a corner. He said, "Come on, you know you want to do it," and he tried to kiss the side of Jessica R.'s neck. Appellant put his penis into her vagina, "thrusted really quickly a couple times and then ran away." Semen found in Jessica R.'s vagina matched appellant's DNA.

*Rape of Elizabeth S.*

Elizabeth S. was a high school senior when she met appellant at a Halloween party in 2010. He had already graduated from the same high school. Elizabeth S. and appellant had a friendly relationship from the time they met until

2

December 21, 2010. On that date, Elizabeth S. drove to a shopping mall and parked her car on the top level of a parking structure. She unexpectedly met appellant inside the mall. He "was very friendly." She agreed to drive him to his friend's house. When they arrived at Elizabeth S.'s parked car, there were no other cars nearby. Appellant said, "I want to have sex with you." Elizabeth S. replied, "No, I do not want to."

Appellant pushed Elizabeth S. onto the backseat of the car. He got on top of her, pulled her pants down, and put his penis inside her vagina. Elizabeth S. "just laid there and didn't do anything." She "knew there was nothing [she] could do to get him off [her]. His entire weight was on [her]." After he had finished, appellant got out of the car and pulled up his pants. Elizabeth S. then drove him to his friend's house.

Elizabeth S. initially told no one about the rape because she "just knew that nobody would ever believe [her]." She eventually told her boyfriend. A few weeks after the rape, her mother found out about it and called the police. In January 2011 Elizabeth S. told the police about the rape but declined to prosecute appellant.

In January 2013 the police contacted Elizabeth S. and said that appellant had raped another woman. Elizabeth S., who had just turned 19, told the police that she was ready to go forward with the prosecution of appellant.

*Appellant's Statements to the Police*

A detective interviewed appellant in November 2012. When the detective showed him a photograph of Jessica R., he did not recognize her. After further questioning, appellant said that he had offered to walk to the Amtrak station with the person depicted in the photograph. Before reaching the station, his girlfriend telephoned and told him to come home immediately. Appellant gave Jessica R. directions to the station, "hugged her goodbye," and left. He had no sexual contact with her.

The detective informed appellant that semen had been found inside Jessica R.'s vagina, and the semen's DNA matched his DNA. Appellant replied: "I asked if she wanted to hook up. She's like, 'Sure.' We went up to the bathroom above the thing and we had sex. I didn't force her to do anything. I didn't rape anybody." After having sex,

3

they hugged and went their "separate ways."  They exchanged phone numbers but never contacted each other.

The detective interviewed appellant again in January 2013.  This time the detective questioned him about his relationship with Elizabeth S.  Appellant said that in November and December 2010 he had consensual sex with her once or twice a week, including the incident in her parked car on December 21, 2010.  At the same time that he was having sex with Elizabeth S., he had a girlfriend named Lacey.  Elizabeth S. tried but failed to persuade appellant to break up with Lacey and have an exclusive relationship with her.  She then started telling people that appellant had had nonconsensual sex with her.  When the detective asked him why Elizabeth S. had lied, appellant replied: "Just to get back at me.  A woman scorned - there's no wrath like a woman scorned."

*Vincent G.'s Testimony Concerning Appellant's*

*Uncharged Sexual Offenses*

Vincent G. testified as follows: In January 2013 he was in jail.  He and appellant were housed in the same room, which contained 18 bunk beds.  Vincent G. made a written complaint to jail authorities about appellant's conduct.  The complaint stated, "[Appellant] has been making unwanted sexual advances."  The complaint was triggered by two incidents.  The first occurred while Vincent G. was sitting on his bunk bed.  Appellant put his hand on Vincent G.'s "lap and tried to touch [him] around [his] penis area."  Vincent G. "pushed [appellant] off and said, 'I don't do that.'"  The second incident occurred while Vincent G. was standing.  Appellant grabbed Vincent G.'s penis from behind.  Vincent G. "pushed him off" and said 'Come on, man.'"  Vincent G. told jail authorities that he wanted appellant to be prosecuted for the sexual acts.

*Admission of Evidence of Appellant's Uncharged Sexual Offenses*

Appellant contends that the trial court erroneously admitted Vincent G.'s testimony about appellant's uncharged sexual offenses.  The testimony was admitted pursuant to Evidence Code section 1108 (hereafter section 1108), subdivision (a), which provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made

4

inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Section 1108 "permits evidence that the defendant committed other sexual offenses to prove his propensity to commit the charged sexual offenses. [Citations.]" (*People v. Cottone* (2013) 57 Cal.4th 269, 281.)

The admission of other sexual offenses pursuant to section 1108 is reviewed for abuse of discretion. (*People v. Ennis* (2010) 190 Cal.App.4th 721, 733.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Appellant committed misdemeanor sexual batteries upon Vincent G. (§ 243.4, subd. (e)(1).) Appellant maintains that the trial court abused its discretion in admitting evidence of these offenses because of "the many differences between" them and the offenses committed against Jessica R. and Elizabeth S. "The main difference," appellant asserts, was that "the uncharged act involved homosexual conduct, and was limited to transient touching." Such conduct "does not support a rational inference that appellant had a predisposition or propensity to rape young women."

The trial court did not abuse its discretion. The uncharged sexual batteries were admissible to show that appellant had a propensity to commit nonconsensual sexual acts with persons irrespective of their sex. Based on Vincent G.'s negative reaction to the first sexual battery, appellant knew that he would object to the second sexual battery committed by grabbing his penis.

The probative value of the evidence of the sexual batteries was not "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice." (Evid. Code, § 352.) The evidence was highly

5

probative.  It rebutted appellant's defense that Jessica R. and Elizabeth S. had consented to have sexual relations with him.  "The testimony describing [appellant's] uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses.  This circumstance decreased the potential for prejudice, because it was unlikely that the jury disbelieved [the victims'] testimony regarding the charged offenses but nevertheless convicted [appellant] on the strength of [Vincent G.'s] testimony . . . regarding the uncharged offenses, or that the jury's passions were inflamed by the evidence of [appellant's] uncharged offenses."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

*Instruction Permitting Jury to Consider Either Charged Rape as*
*Evidence of Appellant's Propensity to Commit the Other Charged Rape*

I

The trial court gave a modified version of CALCRIM No. 1191 permitting the jury to consider either charged rape as evidence of appellant's propensity to commit the other charged rape.  Appellant argues that "this was error because Evidence Code section 1108 permits juror consideration of only uncharged acts as evidence of a propensity to commit the charged offenses."  Appellant maintains that the erroneous jury instruction denied him due process of law under the United States Constitution.

In *People v. Villatoro* (2012) 54 Cal.4th 1152, 1164-1165 (*Villatoro*), the California Supreme Court held that section 1108 permits the admission of evidence of charged offenses to show the defendant's propensity to commit other charged offenses. The court reasoned, "Whether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence."  (*Id*., at p. 1164.)  Appellant "acknowledges this court is thus bound to follow *Villatoro*."  "To preserve the issue for further review," appellant "maintains that the California Supreme Court's decision did not comport with federal constitutional due process requirements."

II

Even if *Villatoro* comports with due process requirements, appellant argues that the instruction in the instant case erroneously informed the jury that, if the People

6

prove a charged offense by a preponderance of the evidence, it can be considered as evidence of appellant's propensity to commit another charged offense. Appellant contends that the jury should have been instructed that a charged offense must be proved beyond a reasonable doubt before it can be considered as propensity evidence.

We disagree. In *People v. Cottone*, *supra*, 57 Cal.4th 269, 287-288, the California Supreme Court concluded that, to be admissible under section 1108, an uncharged sexual offense must be proved by a preponderance of the evidence. There is no reason why section 1108 should be construed as requiring a higher standard of proof for the admission of a charged sexual offense.

*Villatoro* does not support appellant's position. There, the jury instruction required the People to prove a charged sexual offense beyond a reasonable doubt before it could be considered as propensity evidence under section 1108. The Supreme Court did not determine the correct standard of proof. (*Villatoro*, *supra*, 54 Cal.4th at pp. 1167-1168.) It merely observed that, since "the instruction clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity," the instruction "did not impermissibly lower the standard of proof or otherwise interfere with defendant's presumption of innocence." (*Id*., at p. 1168.) The Supreme Court did "not decide . . . whether courts should give such an instruction in the future." (*Id*., at p. 1169.)

Appellant contends: "Allowing the jury to apply the preponderance of the evidence standard for the propensity determination as to the charged crimes risked the jury concluding that the presumption of innocence as to the charged crimes no longer existed once the jury concluded one or both of the charged crimes had been proved by the lower standard of proof. A fair reading of the modified CALCRIM No. 1191 instruction would lead a juror to conclude that, once appellant was found to have committed any charged offense under the lesser standard of proof, then the presumption of innocence as to the other charged crimes no longer applied and he was likely guilty so that even a minimal quantum of proof was sufficient to convict him."

7

Appellant's concern is unwarranted. As modified, CALCRIM No. 1191 provided, "The People must still prove every element of each charged crime and allegation beyond a reasonable doubt." (Underlining omitted.) Furthermore, the trial court gave CALCRIM No. 220 explaining the presumption of innocence and the requirement that the People prove the defendant guilty beyond a reasonable doubt.

*Motion for New Trial and Alleged Brady Violation*

Shortly after appellant was convicted, the prosecutor became aware of documents not disclosed to the defense that might have been discoverable for the purpose of impeaching Vincent G. The prosecutor provided these documents to defense counsel. Appellant moved for a new trial "on the grounds of newly discovered evidence not disclosed by the prosecution in discovery - *Brady* violation." (Italics added.)

"'[T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence . . . although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.] . . . A defendant . . . 'must show a "reasonable probability of a different result."' [Citation.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042-1043; see also *Strickler v. Greene* (1999) 527 U.S. 263, 289 [119 S. Ct. 1936, 144 L. Ed. 2d 286] [the defendant "must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense"].) "'A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Hoyos* (2007) 41 Cal.4th 872, 918, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-643.) "We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that

8

are supported by substantial evidence.  [Citation.]"  (*People v. Letner* (2010) 50 Cal.4th 99, 176.)

Although the motion for a new trial alleged a *Brady* violation, it stated that it was being made pursuant to section 1181, subdivision 8, which applies "[w]hen a motion for a new trial is made upon the ground of newly discovered evidence."  (*Ibid*.) "'To entitle a party to a new trial on the ground of newly discovered evidence, it must appear . . . "[t]hat [the newly discovered evidence] be such as to render a different result probable on a retrial of the cause."'"  (*People v. Martinez* (1984) 36 Cal.3d 816, 821.) "'"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."'  [Citations.]"  (*People v. Turner* (1994) 8 Cal.4th 137, 212, disapproved on another ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)

Appellant claims that the trial court erred in denying his motion for a new trial: "The newly discovered evidence would have undermined, if not completely torpedoed [Vincent G.'s] credibility to the point where the jury would likely have been unable to reach a guilty verdict as to Elizabeth [S.]"  "Appellant's trial counsel was deprived of the right to effectively cross-examine [Vincent G.] thereby impeaching his veracity and credibility. . . . He was prevented from eliciting evidence showing that [Vincent G.] had a pattern of lying to obtain favors of leniency from the Santa Maria Police Department."

In his motion for a new trial, appellant specified what he considered to be the newly discovered material evidence that would have impeached Vincent G.  It included documents showing that (1) in 2011 Vincent G. had provided information to the Santa Maria Police Department in exchange for not booking him into jail, and (2) Vincent G. had lied about his involvement in a carjacking and a shooting.  The newly discovered material evidence also included a letter that appellant had sent to Detective Parker of the Santa Maria Police Department after he had testified at the trial in the instant case.  Vincent G. wrote, "Help me out and work with me.  I promise and give you my word you won't regret it.  Also I already testified on Raul Yescas [appellant] from

9

Santa Barbara.  I bet you already heard about it.  For being my first time I think I did pretty good.  You can call the D.A. from SB and he'll tell you how I did.  Give me a chance. . . . I'm willing to be your best guy and be on your team while me being locked up and even out there.  When I get out I will work with you as well.  I won't let you down."

Finally, the newly discovered material evidence included an email from a juror to the prosecutor in the instant case.  The juror stated: "On behalf of the jury, assuming it's appropriate for you to contact him, will you please convey a message to [Vincent G.] from us?  All of us found him to be a credible and sympathetic witness, and we unanimously voted to 'convict', or whatever the appropriate word may be, [appellant] on the uncharged offenses related to his assaults [upon Vincent G.].  Furthermore, that had a profound effect on the rest of our deliberations and the ultimate result."

The above evidence did not warrant the granting of a new trial on the ground of a *Brady* violation or newly discovered evidence.  The email from the juror was inadmissible.  "[T]he mental processes of the jurors are beyond the hindsight probing of the trial court."  (*Maple v. Cincinnati, Inc.* (1985) 163 Cal.App.3d 387, 394.)  The letter to Detective Parker was not material to the *Brady* issue because it was written after appellant had testified at the trial.  Nor was it newly discovered material evidence under section 1181, subdivision 8.  Nothing in the letter indicates that appellant's testimony was untruthful.

As to the other newly discovered evidence, it is not reasonably probable that the result would have been different if the evidence had been provided to the defense before the trial began.  Nor is the evidence "'"such as to render a different result probable on a retrial of the cause . . . ."'"  (*People v. Martinez*, *supra*, 36 Cal.3d at p. 821.)  It is of no consequence that in 2011 Vincent G. provided information to the Santa Maria Police Department in exchange for not booking him into jail.  Appellant has not shown that the information was false.

On the other hand, Vincent G. could have been impeached with evidence that he had lied about his involvement in a carjacking and a shooting.  (See *People v.*

10

*Ayala* (2000) 23 Cal.4th 225, 271 [defendant could impeach prosecution witness "with evidence that he had once lied to a probation officer about owning a gun"].) But the jury was aware of Vincent G.'s disreputable character. When he testified, he was in handcuffs and was wearing a "County Jail jumpsuit." He said that he was serving 15 years for attempted murder based on an assault with a semiautomatic firearm. He also said that he had been a member of the West Park criminal street gang. The jury was instructed that, in assessing a witness's credibility, it may consider whether the witness has been convicted of a felony. Thus, Vincent G. was not "clothed . . . in a '"false aura of veracity."'" [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

Moreover, Elizabeth S.'s testimony did not need to be corroborated by the evidence of appellant's sexual batteries upon Vincent G. Her testimony was amply corroborated by the evidence of appellant's rape of Jessica R. We are confident that, if Vincent G. had not testified, appellant would still have been convicted of both rapes. We agree with the trial judge's analysis: "I think that the jury convicted [appellant] because they listened to the testimony of two victims who told very similar stories about how [appellant] befriended them, how he gained their trust or confidence and how he abused it. [¶] I think that [appellant] was his own worst enemy in this case. Every time a police officer questioned him, he lied."

Appellant claims that the trial court "failed to conduct a thorough *Brady* analysis." (Bold and capitalization omitted.) Appellant continues, "Had the trial court conducted a complete *Brady* analysis it is likely it would have concluded appellant's motion met all the criteria and granted a new trial." The standard of review for an alleged *Brady* violation is independent or de novo review, and we have complied with that standard. (*People v. Letner*, *supra*, 50 Cal.4th at p. 176.) It therefore does not matter whether the trial court conducted a thorough *Brady* analysis. We have done so and have concluded that there was no *Brady* violation. (See *Stone Street Capital, LLC v. California State Lottery Commission* (2008) 165 Cal.App.4th 109, 116 ["Because we review the trial court's decision de novo, we do not defer to the trial court's ruling or reasons for its ruling. Instead, we decide the matter anew."].)

11

*Section 290.3 Fine*

Section 290.3, subdivision (a) provides that a fine of $300 shall be imposed for a first conviction of forcible rape and a fine of $500 for each subsequent conviction, "unless the court determines that the defendant does not have the ability to pay." At the sentencing hearing, the trial court ordered appellant "to pay a fine of $1,350 pursuant to Penal Code Section 290.3." The court did not explain how it had arrived at this amount. The court minutes and abstract of judgment state, "Defendant ordered to pay $1350 per PC 290.3." The probation report states that the $1,350 figure includes penalty assessments, but does not specify which assessments were included or the amount of each assessment. "[T]here are seven assessments, surcharges, and penalties parasitic to an underlying fine that could increase the fine by 280 percent." (*People v. Voit* (2011) 200 Cal.App.4th 1353, 1374.)

For the first time on appeal, appellant contends that before imposing a section 290.3 fine, the trial court should have determined whether he had the ability to pay the fine. In *People v. McMahan* (1992) 3 Cal.App.4th 740, the defendant made the same contention under similar circumstances. The *McMahon* court concluded that the defendant had waived the contention. It explained: "[T]he most knowledgeable person regarding the defendant's ability to pay would be the defendant himself. It should be incumbent upon the defendant to affirmatively argue against application of the fine and demonstrate why it should not be imposed. [¶] Here, the defendant was informed through the probation report that the probation officer was recommending the imposition of a fine pursuant to section 290.3. No objection to the fine was raised below, nor did defendant make any attempt to show he did not have the ability to pay the fine." (*Id.*, at pp. 749-750.) Like the defendant in *McMahon*, appellant's "failure to object or present contrary evidence waived the right to complain on appeal. [Citation.]" (*Id.*, at p. 750.)

In his reply brief appellant argues that, because his trial counsel did not object, he was denied his constitutional right to the effective assistance of counsel. "It is rarely appropriate to resolve an ineffective assistance claim on direct appeal [citation]; we

12

certainly will not do so where, as here, the claim is omitted from the opening brief and thus waived [citations]." (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

Appellant asserts, "[I]f it had been determined that he had the ability to pay[,] the appropriate fine would have been $300 for the first offense and $500 for the second [offense] for a total base fine of $800." Appellant contends that the matter should be remanded to the trial court with directions to "set forth on the record with specificity the amounts of any penalties and assessments and amend the abstract of judgment to specify" these amounts. We agree. "Although we recognize that a detailed recitation of all the fees, fines and penalties on the record may be tedious, California law does not authorize shortcuts. All fines and fees must be set forth in the abstract of judgment. [Citations.]" (*People v. High* (2004) 119 Cal.App.4th 1192, 1200; see also *People v. Voit*, *supra*, 200 Cal.App.4th at p. 1373 ["the trial court clerk [must] specify the penalties and surcharge in appropriate amounts in the minutes and, more importantly, the abstract of judgment"].)

*The Abstract of Judgment Must Be Amended to*
*Clarify that Appellant Was Sentenced to Consecutive Terms*

The abstract of judgment shows that, pursuant to section 667.6, subdivision (d), appellant was sentenced to 15 years to life on each of the two counts of forcible rape. Section 667.6, subdivision (d) provides, "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions." But part 1 of the abstract of judgment does not show that the 15-year-to-life terms run consecutively to each other. As to count 2, part 1 should be amended to insert an "X" in the box under "consecutive."

*Disposition*

The matter is remanded to the trial court with directions to impose an $800 fine pursuant to section 290.3 plus any required assessments, penalties, or surcharges. The trial court shall prepare an amended abstract of judgment showing the amount of the fine as well as the amount and statutory basis of each assessment, penalty, or surcharge.

13

As discussed in the immediately preceding part of this opinion, the amended abstract shall also show that the 15-year-to-life-sentence on count 2 shall be served consecutively to the 15-year-to-life sentence on count 1.  The trial court shall send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


                                                              YEGAN, J.

We concur:


          GILBERT, P. J.


          PERREN, J.

14

James K. Voysey, Judge

Superior Court County of Santa Barbara

_____

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jonathan J. Kline, Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.