Filed 10/14/21  In re E.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076490 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J284531 & J284532) |
| v. | OPINION |
| G.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

G.B. (father) contends there was insufficient evidence to support a juvenile court's jurisdictional findings under Welfare and Institutions Code[1] section 300, subdivisions (b), (c), (d), and (j), regarding his children, G.B. and E.B. (the children). Father argues those findings should be reversed, and the dispositional order should accordingly be vacated as moot. He also contends the court erred in denying him reunification services under section 361.5, subdivision (b)(6). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 11, 2020, the San Bernardino County Children and Family Services (CFS) filed separate section 300 petitions on behalf of the children. G.B.'s petition contained allegations under subdivisions (b) (failure to protect) and (d) (sexual abuse). E.B.'s petition contained allegations under subdivisions (b) and (j) (abuse of sibling). G.B. was 12 years old at the time, and E.B. was six. By June 11, 2020, CFS filed amended petitions. G.B.'s amended petition alleged that she came within the provisions of section 300, subdivision (b), (c) (serious emotional damage), (d), and (j). It included allegations that her mother, E.G. (mother)[2] and father both sexually abused her, each parent should have known the other was sexually abusing her and failed to protect her, both parents had histories of substance abuse and domestic violence, both parents sexually abused G.B.'s half sibling, I.G., and G.B. was suffering severe emotional harm

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

[2] Mother is not a party to this appeal.

2

as a result of sexual abuse that occurred in both parents' care. E.B.'s amended petition alleged that she came within the provisions of section 300, subdivision (b), (d), and (j) and included allegations that father and mother (the parents) knew or reasonably should have known E.B. was being sexually abused by her sister, G.B., and failed to protect her, each parent knew or reasonably should have known the other parent was sexually abusing G.B., both parents were sexually abusing the half sibling, I.G., and both parents had histories of substance abuse and domestic violence.

The social worker filed a detention report stating that CFS received a referral with allegations of sexual abuse and general neglect of G.B on February 4, 2020. The referral alleged that G.B. took pictures of her bare breasts and sent them to a male student at school via a cell phone and then messaged him through her parents' Instagram account, stating that she had taken pills, overdosed, and was taken to the hospital. When she was taken to the school office, she said she had been cutting herself and wanted to die.

On February 11, 2020, CFS received another referral for sexual abuse of G.B. Two days later, the social worker met with G.B. at Loma Linda Behavioral Health Center (Loma Linda). G.B. acknowledged she had suicidal ideations and self-injurious behaviors. She said she started cutting herself at the age of 11. She also said father began touching her inappropriately when she was five or six years old, and when she was eight years old, he put his penis inside her vagina. She said he did that on at least two occasions and threatened to hurt her if she told anyone. G.B. admitted she took nude photos of herself and sent them to a classmate at school and was expelled.

3

On March 2, 2020, the CFS social worker received a phone call from the social worker at Loma Linda, saying G.B. was ready to be discharged. However, G.B. said that if she had to return home to father, she was going to kill herself. It was subsequently determined that G.B. would be admitted to Loma Linda for being a danger to herself.

On March 2, 2020, another CFS social worker interviewed E.B., who denied any sexual abuse by father. However, she reported that G.B. claimed father was "raping her at night," but she thought G.B. was lying. E.B. said G.B. had her watch videos of "boys jerking off," and encouraged her to take naked pictures of her vagina, which G.B. shared on social media. G.B. also took naked pictures of her. E.B. said G.B. encouraged her to attempt to kill herself so they could be in the hospital together. She further said G.B. was "sexual in the house," and said she "has grabbed the mother and the father in their private parts."

The social worker reviewed a previous CFS investigation from 2014. In that case, mother's oldest daughter, I.G., reported she was sexually abused by father, who was her stepfather. I.G. was in a legal guardianship with her maternal grandparents.[3] She reported that in 2012 she spent the night with the parents and G.B. She and G.B. took a bath together and were playing around in the room naked, while the parents were having sex in another room. I.G. said they invited her and G.B. to get in bed with them, so they did. Then they "all began kissing and licking on each other's private parts." I.G. said

---

[3] The social worker subsequently reported that I.G.'s legal guardians were actually the maternal stepgrandparents.

father started touching and kissing her private part with his tongue. The next day she returned home, and her legal guardian filed a police report.

On March 3, 2020, the social worker interviewed G.B. a second time, and G.B. described more than one occasion in which father touched her breasts, licked her body, and licked her vagina. She said the last occurrence was approximately two years ago. The social worker, however, noted that there was a prior referral call on February 11, 2020, which stated that G.B. said the last incident of sexual abuse was in January 2020. The social worker further observed that G.B. reported father licked her body and vagina, which was the same abuse reported by I.G. in 2014, and that G.B. and I.G. had not had any contact in many years.

On March 6, 2020, the social worker received a phone call from a police officer, who said he had spoken to I.G. I.G. reported that father raped her when she was eight or nine years old, that the parents touched her breasts and vagina, and that they got G.B. to go in their bedroom and take her clothes off, and they touched her inappropriately. That same day, the social worker spoke to the maternal stepgrandmother (I.G.'s legal guardian), who said that, approximately eight years prior, I.G. visited the parents, and they molested her on the first night. I.G. called her the next morning crying and wanted her stepgrandmother to pick her up. When the stepgrandmother arrived to pick her up, G.B. wanted to leave with them as well.

The court held a detention hearing on March 12, 2020, and detained the children in CFS's care with authority to place them with appropriate relatives. It ordered CFS to provide services pending the development of a case plan. The court set the matter for

hearing on April 3, 2020.  However, the hearing was continued to May 8, 2020, and then June 12, 2020.

On May 27, 2020, the social worker filed an informational memorandum with the court and reported, in part, that G.B. AWOL'd[4] frequently from her prior placement. G.B. reported using alcohol and methamphetamine and having sexual relations with a 19-year-old.  A child and family team (CFT) meeting was held on April 7, 2020, to discuss the risks of her AWOL behavior, substance abuse, and promiscuity.  Despite the CFT meeting, G.B. continued to AWOL and claimed to have been sexually trafficked out. The social worker reported that an alternate placement was sought in a different county to distance her from the alleged trafficker.  G.B. moved to a new placement on April 24, 2020, but continued to AWOL.  The social worker further reported that G.B. had been hospitalized several times for self-harm.

*Jurisdiction/Disposition Report*

The social worker filed a jurisdiction/disposition report on June 8, 2020, recommending that the court sustain the petitions and deny services to both parents under various subdivisions under section 361.5.  G.B. was living in a group home, and E.B. was living with a nonrelative extended family member.

The social worker reported that she spoke with G.B. on March 27, 2020.  G.B. denied sexual abuse by mother but maintained that father had sexually abused her.  She said that when she was five years old, he groped her by touching her vagina with his

---

**4** AWOL stands for "absent without leave."  (*Perez v. Merit Systems Protection Board* (1991) 931 F.2d 853, 854.)

hands.  She recalled another incident when he put his penis in the tip of her vagina.  She disclosed another incident with I.G. when father took off their clothing and licked their vaginas, while mother and the maternal stepgrandmother were talking in the front yard.  Another time, father came into G.B.'s room around midnight and told her to take her clothes off.  When she refused, he took her clothes off and stuck his penis in her vagina.  She could not remember her age but recalled living in Lucerne Valley at the time.  G.B. then recalled a time in third grade when father told her to take off her clothes, and he ejaculated in her face.  When she was 10 years old, he came into her room, took his penis out, and told her to suck it.  She denied that mother touched her inappropriately or sexually abused her or E.B.

The social worker further reported that G.B. was diagnosed at Loma Linda with Major Depressive Disorder without Psychotic Features, Bulimia Nervosa, Generalized Anxiety, substance use disorder, and Post-Traumatic Stress Disorder.  Furthermore, G.B. indicated she had been cutting herself daily, since her discharge.  G.B. was on several medications for her mental health issues, continued to have suicidal ideations, and claimed she heard voices when in distress.  She also attempted to engage in a sexual relationship with a peer at Loma Linda.  The social worker reported that G.B. was described as being hypersexual.

The social worker also reported that father denied the allegations of sexually abusing G.B. and I.G.  He said the two girls had been in contact for the last year and claimed that I.G. was a trigger to G.B. acting out.  He said he caught G.B. watching pornography on a cell phone when she was eight years old.  The social worker further

reported that father had prior dependency cases concerning different children from 2000-2004, and he was not offered reunification services due to two prison sentences for having a methamphetamine lab in the home. Father's parental rights were terminated on August 15, 2001.[5]

Additionally, the social worker reported that E.B. said G.B. tried to suffocate her with a pillow. She also said G.B. would always do group chats with boys and show them her breasts. E.B. denied that anyone touched her private parts or that she had seen anyone else's private parts.

The social worker observed that the parents denied the allegations and appeared to be blaming the children, the internet, G.B.'s friends, and G.B.'s mental health for the allegations. The social worker stated that, although G.B. appeared to embellish and "create[] a more colorful version of events," CFS believed the parents did sexually abuse her and I.G. The social worker opined that G.B.'s acting out behaviors were indicative of severe sexual abuse, and she was exhibiting telltale signs of severe trauma.

The court held a jurisdiction/disposition hearing on June 12, 2020, and continued the matter to July 21, 2020. The hearing was continued several times and was eventually held on January 6 and 7, 2021. (See *post*.)

*Additional Information for the Court*

On September 15, 2020, the social worker filed an informational memorandum and reported that G.B. was located in Utah but was brought back to California on

---

[5] The record does not show which of father's children the dependency cases concerned or why his parental rights were terminated.

September 10, 2020. G.B. completed a forensic sexual abuse examination on September 11, 2020, and the results were pending.

The social worker filed another memorandum on September 18, 2020, and reported that G.B. was placed in a group home on September 11, 2020, after returning from Utah. However, she absconded from the group home and was found unconscious and under the influence. G.B. reported that she takes methamphetamine and heroin.

In another informational memorandum filed on October 7, 2020, the social worker reported that G.B. continued to abscond from placement and would return under the influence most times. The results of the September 11, 2020 forensic examination could not confirm or negate sexual abuse. G.B. completed another examination on September 18, 2020, and the results were pending. The forensic interviewer reported that G.B. disclosed ongoing sexual abuse by father, beginning at age five. G.B. reported a time when she was in the bathroom with her pants down and father came in and fondled her vagina. She also recalled a time when she was nine years old, and he penetrated his penis into her vagina, and "it hurt real bad." She said when she was 11 years old, father forced her to orally copulate him, and when they heard mother coming, he pulled up his pants. G.B. denied that mother ever sexually abused her. In light of the interview, CFS dismissed the sexual abuse allegations against mother and amended its recommendation to offer her family maintenance services.

*Police Report*

The social worker filed a copy of a police report stating that an officer interviewed G.B. on February 13, 2020. She told the officer father first sexually abused her when she

9

was approximately five years old. She said she was getting out of the shower when he approached her in the bathroom, and she was wearing nothing but a towel. He put his hand on her bare vagina. He then threatened to hurt her if she told anyone he touched her inappropriately. The second incident also happened when she was five when she was sleeping in her bed and woke up to father touching her vagina with his hand. He digitally penetrated her vagina with one or several fingers. G.B. said the first time he put his penis inside her vagina was when she was eight years old. She fell asleep in his bed and woke up naked. He had the tip of his penis inside her and "tried to go further," but she pushed him off and ran to her bedroom. The next incident occurred when she was nine years old when she was visiting her grandmother on her birthday. She went to sleep with I.G. in her room, and father entered the room, took both of their shorts and underwear off, and orally copulated them. G.B. said the last incident occurred in January 2020. She was playing a videogame in her room when father came in and told her to take off her clothes. When she refused, he forcefully took her clothes off, unzipped his pants, and put his penis in her vagina.

The police officer asked G.B. if she could describe father's penis, and she initially said she had never seen it. She then recalled an incident that occurred when she was 10 years old; father entered her bedroom, unzipped his pants, placed his penis on her face, and told her to "suck it." When the officer pointed out she previously said she had never seen his penis, she sat quiet for a minute, and then said she had seen it and went on to describe it. The officer also noted she had some inconsistencies in her story, so he asked her to tell him again what happened in January 2020. G.B. said after she got home from

10

school, her sister was playing a videogame in the living room, and she was in her bedroom. Father entered and told her to take off her shirt. When she refused, he threatened to hit her, so she removed her shirt and bra. He unzipped his pants and started to masturbate and fondle her at the same time. He eventually told her to lay on her back, and he ejaculated on her face.

*Jurisdiction/Disposition Hearing*

The court held a contested jurisdiction/disposition hearing, beginning on January 6, 2021. G.B. testified that none of what she had told the social worker about father sexually abusing her was true. She then said she was not going to answer any questions. When asked why she made the disclosures if they were untrue, she said her grandmother (the one I.G. lived with) told her that if she made the allegations against her parents, Child Protective Services would take her away, and she could go live with her. G.B. said her grandmother promised her an iPhone and a house by the beach if she made the allegations. G.B. cussed throughout her testimony and said she "want[ed] this to be all dismissed," so she could just go home. On cross-examination, G.B. said people did not believe her, and when asked why she thought that, she said, "Because I lie a lot."

Father testified at the hearing and said he did not think the children should be removed from his and mother's custody because they were "really good parents." He continued to deny ever sexually assaulting or molesting anyone.

The social worker testified that G.B. was interviewed at the Children's Assessment Center (CAC) on September 18, 2020. The social worker was not present for the interview but watched a recording of the interview and talked to the forensic

11

interviewer. She testified that during the interview, G.B. did not say the maternal grandmother told her to lie about the allegations. Rather, she was consistent with her sexual abuse allegations and did not recant anything. The social worker further testified that it was very common for children to recant sexual abuse allegations. She believed G.B. was sexually abused by father because her behavior at a very young age showed "very typical signs of a child who has been sexually abused." The social worker specified that G.B. was hypersexualized and was looking at pornography at age eight, and it was very uncommon for a child of that age to be interested in sexual conduct.

The social worker further testified that G.B.'s statements were very consistent with the various people who interviewed her, including police officers, detention workers, the forensic interviewer, and the social worker herself. The social worker also said G.B.'s conduct, including her high-risk behavior, her desire for all of this to be over, and the recanting of her statements, were also very typical of a child who had been sexually abused. When asked her opinion about the fact there were discrepancies in G.B.'s stories regarding her age or time, the social worker said it was all trauma-related, and there was "going to be blockage of memory" and "everything will be convoluted."

The social worker also testified that she investigated a referral of E.B. acting out sexually to her caregivers' children. E.B. told the two young children she was staying with to take off their clothes. She then touched their genital areas and had them touch her genitals. The caregiver reported that, when she asked E.B. where she had learned that behavior, E.B. said, "This is what my family does."

After hearing testimony and closing arguments, the court stated there was extensive evidence that something sexual happened to G.B., and very well could have happened to E.B. It noted that G.B. had been sexually acting out since she was eight years old, and now E.B. was acting out. The court noted that G.B.'s behavior was extremely consistent with a child who had been sexually abused. It observed that she told a number of people, in graphic detail, about the sexual abuse by father, and some of it was corroborated by I.G. The court stated that it did not believe G.B.'s recantation of the sexual abuse allegations "for a second." It was very disturbed that they heard for the first time in court that G.B. was bribed into making the sexual abuse allegations. It then found her statements to multiple people that she was molested by father to be true. The court also believed I.G.'s statements were true. Therefore, as to G.B., the court found true the allegations that father sexually abused her, she suffered severe emotional damage as a result of the abuse, and he sexually abused her half sibling, I.G., and found that G.B. came within section 300, subdivisions (b), (c), (d), and (j).[6] As to E.B., the court found that father sexually abused her sibling and half sibling, and she came within subdivisions (b), (d), and (j). It additionally found that, considering father was denying the abuse ever occurred nine months into the dependency case, even with the services he was participating in, it was not in the children's best interests for him to receive reunification services. The court then declared the children dependents of the court, removed them

---

[6] The court also found true some allegations against mother.

from the parents' custody, ordered reunification services for mother, and bypassed services for father under section 361.5, subdivision (b)(6).

## DISCUSSION

### I. There Was Substantial Evidence to Support the Court's Jurisdictional Findings

Father argues there was insufficient evidence to support the findings that he sexually abused G.B. or I.G.; therefore, the evidence was insufficient to support the jurisdictional findings under section 300, subdivisions (b), (d), and (j). He specifically claims it was inherently improbable that he sexually abused G.B. or I.G. He further contends that, as a result, the court erred in bypassing his services under section 361.5, subdivision (b)(6). We conclude there was substantial evidence to support the finding that father sexually abused G.B. and I.G. and to sustain the jurisdictional findings.[7] Consequently, we also conclude the court properly bypassed his services.

#### A. *Standard of Review*

"The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to all appeals. If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.] We do

---

[7] We acknowledge respondent's initial contention that father's challenge appears "to conflate" the sexual abuse allegation under section 300, subdivision (d) (severe abuse) with the allegations under subdivisions (b) (failure to protect), (c) (serious emotional damage), and (j) (abuse of sibling). Respondent argues father's claim is not justiciable since there are several unchallenged findings that support the court's jurisdiction over the children. However, the allegation that father sexually abused G.B. and I.G. is at the crux of the jurisdictional findings the court made under the various subdivisions. Thus, in effect, father is challenging all of the jurisdictional findings on the basis of the insufficiency of the evidence of sexual abuse.

14

not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citations.] The appellant has the burden of showing the finding or order is not supported by substantial evidence. [Citation.]" (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333-1334 (*Christopher L.*)

B. *The Evidence Was Sufficient*

There was more than sufficient evidence to support the court's finding that father sexually abused G.B. and I.G. The evidence shows the social worker first interviewed G.B. on February 13, 2020, and she said father began touching her inappropriately when she was five or six years old. She also said that when she was eight years old, he put his penis inside her vagina. She said he did that on at least two occasions and threatened to hurt her if she told anyone. On March 3, 2020, G.B. told the social worker that father touched her breasts, licked her body, and licked her vagina. The social worker observed that this was the same abuse reported by I.G. in 2014, and that G.B. and I.G. had not had any contact in many years.

Furthermore, the record shows that, on March 27, 2020, G.B. continued to allege that father had sexually abused her. She specifically recalled that father groped her when she was five years old, and he put his penis in the tip of her vagina on different occasions. G.B. further recalled a time in third grade, when father told her to take off her clothes,

15

and he ejaculated in her face. When she was 10 years old, he came into her room, took his penis out, and told her to suck it.

Additionally, G.B. disclosed to a forensic interviewer that she was sexually abused by father, beginning at age five. She specifically recalled an instance of fondling when she was five years old, an instance when father penetrated his penis in her vagina when she was nine years old, and an instance when he forced her to orally copulate him when she was 11 years old.

The evidence also contained a police report from February 13, 2020, showing that G.B. reported father first sexually abused her when she was approximately five years old. She reported an instance when he fondled her after she got out of the shower, and an instance when she was sleeping in her bed and woke up to him touching her vagina and then he penetrated her with his fingers. G.B. also reported, in great detail, instances when father put his penis inside her vagina and orally copulated her and I.G.

Furthermore, the evidence showed that G.B. suffered serious emotional damage and consequently acted out. She had suicidal ideations, threatened to kill herself if she had to return home to father, used methamphetamine and alcohol, was constantly AWOL from her placements, and was promiscuous. G.B. was diagnosed with Major Depressive Disorder without Psychotic Features, Bulimia Nervosa, Generalized Anxiety, substance use disorder, and Post-Traumatic Stress Disorder.

Moreover, the social worker testified at the jurisdiction/disposition hearing that G.B. was hypersexualized. She testified that G.B. was watching pornography at age eight, and that it was very uncommon for a child that age to be interested in sexual

16

conduct. The social worker further observed that G.B.'s statements had been very consistent with the various people who interviewed her, including police officers, detention workers, the forensic interviewer, and the social worker herself. She testified that it was very typical for a child who had been sexually abused to have high risk behavior like G.B.'s and to recant her statements. To the extent there were discrepancies in G.B.'s stories, the social worker testified that there would be "blockage of memory" and "everything [would] be convoluted," because of the trauma she had suffered.

There was also evidence that father sexually abused I.G. I.G. reported that he touched her, kissed her, and licked her private parts. A police officer informed the social worker that I.G reported father raped her when she was eight or nine years old, and that the parents touched her breasts and vagina. Moreover, G.B. disclosed an incident when she and I.G. were together, and father took off their clothing and licked their vaginas, while mother and maternal stepgrandmother were talking in the front yard.

Father claims this court should reverse the finding that he sexually abused G.B. and I.G. because it was inherently improbable that he abused them, and the falsity of their statements was apparent on the record. He cites *Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, which states: " 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category [citation]. To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " (*Id*. at p. 492.) However, we

17

note the *Evje* court also held, " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Ibid*.) The court also observed that for an appellate court to reject statements that a trial court believed, "it is required that the testimony be 'wholly unacceptable to reasonable minds' [citation]; 'unbelievable *per se*' [citation] such that 'no reasonable person could believe the testimony' [citation]." (*Ibid*.) We further note that "[w]hile an appellate court can overturn a judgment when it concludes the evidence supporting it was 'inherently improbable,' such a finding is *so rare* as to be almost *nonexistent*." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728, italics added.)

Here, the trial court believed that father sexually abused G.B. and I.G., and there was nothing inherently improbable about their statements of abuse, as father claims. G.B. was generally consistent in her statements about the abuse to various people throughout the dependency. The fact that she recanted her statements and was inconsistent as to some aspects of her testimony was very typical of a child who had been sexually abused. Such inconsistencies and discrepancies were for the trial court to consider in light of all of the evidence and determine which statements it believed to be true. Moreover, what was more likely to be improbable was the story G.B. told for the first time at the hearing that the maternal grandmother promised her an iPhone and a beach house if she made the sexual allegations against father. Father points out the social worker testified that the referral alleging he and mother sexually abused I.G. in 2014 was

18

investigated by CFS and deemed inconclusive. However, the social worker also testified that I.G.'s statements were important "[b]ecause years later another child was disclosing the same issue." As the social worker observed, I.G. alleged that father licked her body and vagina, and so did G.B. The similarities in their allegations added to the credibility of the statements.

In sum, there was overwhelming evidence that father sexually abused G.B., as well as I.G., and that G.B. suffered serious emotional harm from the abuse and acted out. Viewing the evidence in the light most favorable to the juvenile court's order, as we must, we conclude there was substantial evidence to support the court's jurisdiction over the children. (*Christopher L.*, *supra*, 143 Cal.App.4th at p. 1333.)

C. *The Court Properly Bypassed Father's Services*

Father simply claims that, since the evidence of the sexual abuse allegations against him were "so contradicted and unsupported," the court erred in applying the bypass provision under section 361.5, subdivision (b)(6). Under section 361.5, subdivision (b)(6), the court may deny reunification services to a parent when "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse . . . to the child, a sibling, or a half sibling by a parent . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent." In light of our conclusion that the evidence was sufficient to support the court's finding of sexual abuse, we reject father's claim. Furthermore, the court found it was not in the children's best interests to offer father reunification services, since he persisted in denying the abuse ever happened, and we

19

note that he does not dispute that finding.  We conclude the court properly bypassed

father's services under section 361.5, subdivision (b)(6).

DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS _____

J.


We concur:


RAMIREZ _____

P.J.


MILLER _____

J.