[No. G041481. Fourth Dist., Div. Three. Dec. 1, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM COOK ENNIS II, Defendant and Appellant.

COUNSEL

Richard De La Sota, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Donald W. Ostertag and Pamela Ratner Sobeck, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEDSWORTH, J.**—William Cook Ennis II was convicted of various crimes involving sexual molestation of his daughter, then age eight, and his step-daughter, then age 14. He was sentenced to prison for an aggregate term of 64 years.[1]

---

[1] Ennis was convicted of three counts of performing a lewd act on a child under the age of 14 (Pen. Code, § 288, subd. (a)) (all further statutory references are to the Penal Code, unless otherwise indicated); three counts of forcible oral copulation (§ 288a, subd. (c)(2)); one count

Ennis's primary contention on appeal is that the evidence adduced at trial was insufficient to support his convictions. He acknowledges there was testimony which, if believed, was sufficient to establish he did commit the crimes of which he was convicted, but argues that testimony was inherently improbable—by which he means full of contradictions, inconsistencies and implausibilities—and thus no rational jury could have relied upon it as a basis to convict. The contention is unpersuasive.

The "inherently improbable" standard for rejecting testimony on appeal is not merely an enhanced version of implausibility, as Ennis seems to be asserting. "*Highly* implausible" is still an argument reserved for the trier of fact. Inherently improbable, by contrast, means that the challenged evidence is "unbelievable per se" (italics omitted), such that "the things testified to would not seem possible." (*Lane v. Safeway Stores, Inc.* (1939) 33 Cal.App.2d 169, 175 [91 P.2d 160].) The determination of inherent improbability must be made without resort to inference or deduction, and thus cannot be established by comparing the challenged testimony to other evidence in the case.

Because Ennis's inherent improbability claim is based entirely on comparisons, contradictions and inferences, it amounts to nothing more than an attack on witness credibility, and cannot be the basis for a reversal of the judgment on appeal.

Ennis also argues (1) the trial court erred by allowing evidence of additional, uncharged sexual offenses to be introduced pursuant to Evidence Code section 1108 and by excluding his proffered expert testimony about police interrogation of minor child abuse victims and (2) that the prosecutor committed misconduct in his closing statement. We reject these contentions as well. In the circumstances of this case, in which the uncharged sexual offenses were largely carried out against one of the same victims (but in a different jurisdiction) and were supported by the same witness testimony as the crimes in this case, we conclude the additional evidence was not the sort " ' "which uniquely tends to evoke an emotional bias against the defendant as an individual . . . ." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) Whatever emotional bias might have been invoked against Ennis at trial, would have been fully invoked by the multitude of horrific crimes actually charged in this case. The additional evidence suggesting he may have done more of the same to one of those

---

of performing a lewd act on a child (§ 288, subd. (a)); one count of forcible penetration by a foreign object in violation of section 289, subdivision (a)(1)(A); one count of attempted forcible oral copulation in violation of sections 664 and 288a, subdivision (c)(2); four counts of performing a lewd act on a child 14 years of age and at least 10 years younger than him (§ 288, subd. (c)(1)); and one count of attempted rape (§§ 664, 261, subd. (a)(2)).

victims, and perhaps to another family member as well, in Arizona, would not significantly change the jury's perception of him.

As for Ennis's assertion the court refused to allow his proffered expert testimony, we agree with the Attorney General's contention the court made no such ruling. The court merely indicated a tentative decision to disallow the evidence, but then expressly granted Ennis the right to argue the issue further on the next court day, when the expert was scheduled to testify regarding another issue. Ennis apparently elected not to do so, and made no further effort to introduce the testimony. Consequently, the issue was waived.

Finally, Ennis complains of prosecutorial misconduct. But, he concedes, he offered no objection to the prosecutor's challenged remarks at the time they were made in closing argument, and requested no curative instruction to the jury. Moreover, we find no support in the record for Ennis's assertion it would have been "futile" to do so. Accordingly, any objection to the challenged comments was waived.

## FACTS

Ennis's convictions for sexual abuse were based primarily on the statements to police and in-court testimony given by his ex-wife, K., his daughter, C.— eight years old at the time of the crimes alleged—and his stepdaughter, C.S., who was 14 years old at the time of the alleged crimes.

These witnesses accused Ennis of what can only be described as horrific sexual abuse of both C. and C.S., over a period of several months while the family lived in San Clemente in late 2003. K., who had a drug dependency and mental health issues, was aware of the abuse, and directly witnessed much of it.[2] Ennis's alleged acts included vaginal and anal intercourse with C., requiring C. to orally copulate him in front of C.S., requiring C. to orally copulate a friend of his, forcing C.S. to orally copulate him, and forcibly copulating C.S.

In late 2003 or early 2004, Ennis, K. and C. went to live with Ennis's parents in Arizona, while C.S. was sent to live with her father. While living in Arizona, Ennis allegedly committed further acts of sexual abuse against C., and against her younger sister who was disabled with muscular dystrophy.

In April of 2004, Ennis and K. appointed Ennis's parents, Laura and Bill Ennis, to act as legal guardians of their children, including C. and two

---

[2] K. herself pleaded guilty to "pretend[ing]" to orally copulate C. and another daughter while living in Arizona, although she later claimed the charge was untrue. She spent a year in jail as a result of the plea.

younger siblings. K. claimed she did so only because Ennis forced her to. Ennis moved out of his parents' house in October of 2004, because his parents felt he and K. were fighting too much in front of the children. After he moved out, Ennis began seeing another woman, and there was evidence K. was angry and jealous about his new relationship.

K. continued to reside in the Ennis home until February of 2005. According to Laura, K. was asked to leave the home after she accused Bill of asking her to have sex with him.

In the first year after C.S. began living with her father in early 2004, she told only one friend about having been sexually molested by Ennis. But in February of 2005, C.S.'s stepmother, T., asked her if Ennis had ever done anything to her. C.S. told her he had. She had not confided this information before because she was embarrassed and afraid people would think her "weird."

Police were called, and Detective Larry Matthews of the Mohave County Sheriff's Office, interviewed C. on February 17, 2005. The interview was both audio and videotaped. C. told Matthews that both Ennis and K. had orally copulated her while they were living in Ennis's parents' home. She also related other incidents of sexual abuse in Arizona, including some involving her disabled younger sister, and others which took place while she visited Ennis and his new girlfriend at a hotel. C. also told Matthews of sexual abuse that took place while the family was living in San Clemente. C. later recanted these claims, and testified at trial that none of it was true.

C.S. was interviewed by a police officer on February 11, 2005. She related three instances of sexual abuse during the time she lived with Ennis and K. in San Clemente.

C.S. was also interviewed by representatives of the Orange County District Attorney's Office in January of 2007. In that interview, C.S. described five separate severe incidents of sexual abuse, along with two others of lesser severity. The details she described differed from those she had described in her earlier interview.

At trial, the prosecution offered the testimony of Anthony Urquiza, Ph.D., an expert in what is known as child sexual abuse accommodation syndrome (CSAAS), who explained the five characteristics commonly exhibited by sexually abused children and how those cause the children to develop certain coping mechanisms and react in often unexpected ways. CSAAS is not a diagnostic tool, however, and the fact a child exhibits some of the characteristics does not suggest any abuse has occurred. CSAAS is merely a treatment

tool, designed to help those children believed to have been abused, and to explain their behavior. In the context of discussing CSAAS, Urquiza explained why it was not unusual for child sexual abuse victims to recant their accusations.

The prosecution also offered the testimony of Sherry Malm, a mental health counselor, who conducted therapy sessions with C. in 2005. During those sessions, C. suggested Ennis used sexual abuse as a means of punishing her, and she never indicated she had lied to the police when she made her claims of sexual abuse.

The jury found Ennis not guilty of the crime charged in count 1 of the information, and guilty of 14 other counts. The jury found the allegation that Ennis had committed the crimes against more than one victim to be true on seven of the counts, but false as to three of the counts. The jury also found true the allegation that Ennis had bound the victim during the crime charged in count 6.

I

Ennis's first contention on appeal is that the judgment must be reversed because, although "[t]here was testimony relating to each of the charges for which appellant was convicted[,] that testimony was inherently improbable and unworthy of belief." Ennis claims the evidence supplied by each of the three main witnesses against him—his former wife, K., his daughter, C., and his stepdaughter, C.S.—was unworthy of belief, pointing to the fact that C. had recanted her allegations by the time of trial, and characterizing the testimony of the other two as full of "discrepancies and inconsistencies."

■ However, as our Supreme Court has made clear on repeated occasions, " '[g]enerally, "doubts about the credibility of [an] in-court witness should be left for the jury's resolution." ' (*People v. Mayfield* (1997) 14 Cal.4th 668, 735 [60 Cal.Rptr.2d 1, 928 P.2d 485].) 'Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution . . . .' (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].)" (*People v. Hovarter* (2008) 44 Cal.4th 983, 996 [81 Cal.Rptr.3d 299, 189 P.3d 300].)

While an appellate court can overturn a judgment when it concludes the evidence supporting it was "inherently improbable," such a finding is so rare as to be almost nonexistent. " 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' ([*People v. Huston*

(1943) 21 Cal.2d 690, 693 [134 P.2d 758], overruled on another ground by *People v. Burton* (1961) 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433]].) Such cases are rare indeed. (*Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492 [261 P.2d 279].)" (*DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 261 [104 Cal.Rptr.3d 93].)

The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying. Hence, the requirement that the improbability must be "inherent," and the falsity apparent "without resorting to inferences or deductions." (*People v. Huston, supra*, 21 Cal.2d at p. 693.) In other words, the challenged evidence must be improbable " 'on its face' " (*People v. Mayberry* (1975) 15 Cal.3d 143, 150 [125 Cal.Rptr. 745, 542 P.2d 1337], quoting *People v. Headlee* (1941) 18 Cal.2d 266, 267 [115 P.2d 427] ["[t]o be improbable on its face the evidence must assert that something has occurred that it does not seem possible could have occurred under the circumstances disclosed"]), and thus we do not compare it to other evidence (except, perhaps, certain universally accepted and judicially noticeable facts). The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened? (15 Cal.3d at p. 150.)

Consequently, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (*People v. Huston, supra*, 21 Cal.2d at p. 693.) "Testimony may be rejected only when it is inherently improbable or incredible, i.e., ' "unbelievable per se," ' physically impossible or ' "wholly unacceptable to reasonable minds." ' " (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065 [1 Cal.Rptr.2d 195], italics omitted.)

Just this year, in *People v. Thompson* (2010) 49 Cal.4th 79, 124–125 [109 Cal.Rptr.3d 549, 231 P.3d 289], the Supreme Court flatly rejected the contention that a certain witness's testimony was "inherently incredible" on the basis it contradicted physical evidence, noting "Mercurio's testimony did not recount facts that were physically impossible, nor did it exhibit falsity on its face. Rather, defendant's contention that Mercurio's testimony was inherently incredible depends on the asserted inconsistencies that defendant argues exist between Mercurio's testimony and other evidence presented at trial. We reject defendant's attempt to reargue the evidence on appeal and reiterate that 'it is not a proper appellate function to reassess the credibility of the witnesses.' (*People v. Jones* (1990) 51 Cal.3d 294, 314–315 [270 Cal.Rptr. 611, 792 P.2d 643].)"

Similarly, in *DiQuisto v. County of Santa Clara, supra*, 181 Cal.App.4th 236, the court rejected the assertion that the county executive's testimony was insufficient to support the judgment because it was "undermined by his later testimony," and " 'contradicted' " by the county's own written documents. The court explained that such weaknesses are irrelevant, since the claimed falsity is not " 'apparent without resorting to inferences or deductions.' " (*Id.* at p. 261.)

In this case, Ennis is making just that sort of "inferences and deductions" argument. He does not claim it would be impossible for him to have committed the acts of sexual abuse attributed to him, but instead suggests the jury should have inferred or deduced from the circumstances in which these allegations arose, or the other evidence admitted in the case, that each of these witnesses was lying. Specifically, Ennis contends K.'s testimony is suspect because she has both mental health and drug use problems, she had otherwise indicated a desire to fabricate evidence against Ennis out of anger and jealousy about his new girlfriend, and because "she veered in her testimony from implicating appellant, to exonerating him, to implicating him again." He contends C.'s statement to police, implicating Ennis, was given "reluctantly and inaudibly," and was subsequently recanted, and is consequently unworthy of belief. And he contends C.S.'s testimony, while consistent in asserting Ennis committed the crimes charged, is incredible because (1) "her versions of events are so wildly at odds with one another and with the versions of other witnesses that they are unworthy of belief" and (2) her failure to report the abuse and her decision to stay in the home with Ennis "are so at odds with normal behavior that her testimony cannot be said to constitute substantial evidence of appellant's guilt."

None of these arguments is cognizable on appeal. The jury found the abuse claims against Ennis to be credible despite the weaknesses he points to on appeal, and we cannot second-guess that determination. A similar version of the inherently improbable argument was made in *In re S.A.* (2010) 182 Cal.App.4th 1128, 1149–1150 [106 Cal.Rptr.3d 382], a juvenile dependency case which also involved claims of sexual molestation, and was flatly rejected by the court: "Kent points out discrepancies in the evidence as to exactly when the sexual abuse began and ended, where it occurred, and its frequency. He also claims S.A.'s testimony is implausible because, for instance, she wrote in her diary that she lost her virginity to David, and she did not write about any sexual abuse by Kent; . . . S.A. was happy to have Kent adopt her; her physicians never saw any sign of abuse; and she had earlier recanted allegations of abuse to a social worker and police officers. Kent also argues that because S.A. was sexually abused in Trinidad, her 'acting out' cannot possibly be attributed to any sexual abuse by him. [¶] None of the matters

Kent raises suggests S.A.'s testimony or other evidence supporting the court's ruling is inherently improbable. The matters do not show any physical impossibility, apparent falsity or extreme outlandishness. Rather, inconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court. . . . Under the guise of inherent improbability, Kent invites us to usurp the juvenile court's factfinding role, which we decline to do. [Citation.]"

Ennis cites only two cases, *People v. Carvalho* (1952) 112 Cal.App.2d 482 [246 P.2d 950],[3] and *U.S. v. Chancey* (11th Cir. 1983) 715 F.2d 543, as examples of appellate courts reversing judgments on the basis of inherent improbability. Both are distinguishable, and for the same reason. In both *Carvalho* and *Chancey*, the defendant had been convicted of kidnapping, and in both cases, the court actually *credited the story* told by the victim, but concluded it was simply insufficient to support the conclusion she had been held against her will—a necessary element of the crime charged.

In *Carvalho*, the complaining witness was the defendant's estranged wife. The court noted that while "the prosecutrix testified she was in fear of appellant, . . . if ever there was a case for the application of the trite saying, 'Actions speak louder than words,' this is one. Neither during the time the complainant was with appellant nor in the month thereafter did her actions and conduct reflect any fear of him." (*People v. Carvalho, supra*, 112 Cal.App.2d at pp. 489–490.) The court noted the complainant had numerous opportunities to leave, but chose not to. Moreover, the complainant testified that while she was with the defendant at his rooming house, purportedly against her will, they "commenced 'making love,' which was consummated by an act of sexual intercourse between them. [Then,] he went down the hall to the bathroom while the prosecutrix remained in the bedroom where the weapon was allegedly reposing on the dresser or in a drawer, and she waited for him to return. Appellant then shaved, removed his clothing and proceeded to take a bath. With all this opportunity to leave she proceeded into the bathroom and washed his back, neck and arms for him." (*Id.* at p. 490.)

The *Carvalho* court noted that after the defendant's bath, the couple went to a café, and "[w]hile enroute to dinner she stopped her automobile, alighted therefrom, went into a public telephone booth and called her son. She did not advise her son of her claimed predicament, nor did she telephone the police. [¶] When appellant finally left her, saying he would take a streetcar to his home, she made no complaint to the police." (*People v. Carvalho, supra*, 112 Cal.App.2d at p. 490.)

---

[3] We note that this is an area of the law in which the age of the precedent—and the changes in understanding about the psychology of victimization since its publication—is relevant.

The *Carvalho* court accepted as true everything the complainant said, but then held that "[t]he foregoing circumstances do not in our opinion reasonably *justify the conclusion* reached in the court below *that the prosecutrix was transported by the use of force and held in captivity through fear on her part.*" (*People v. Carvalho, supra,* 112 Cal.App.2d at p. 491, italics added.)

*U.S. v. Chancey, supra,* 751 F.2d 543, is similar to *Carvalho,* in that the appellate court accepted as true everything the victim said, but then concluded those facts simply did not add up to the conclusion the victim had been held against her will. As the *Chancey* court explained, the victim, "Miss Tamara Kay Goshern[,] is the sole witness to lack of consent. Regardless of what she says, her every *act* and *deed,* as she described them, shout that when she drove her car across the Florida state line, she did it voluntarily. And the same is true from Florida all the way to California and after the travelers arrived there." (*Id.* at p. 547.)

█ In this case, by contrast to both *Carvalho* and *Chancey,* neither we, nor the jury, had occasion to draw conclusions about the victims' state of mind—if Ennis did the things they say he did, he is guilty of the crimes charged without regard to how the victims felt about it—and unlike the appellants in *Carvalho* and *Chancey,* so he is actually asking us to *disbelieve* the witnesses' claims about what happened, on the ground that the surrounding circumstances, or other evidence adduced in the case, makes those claims seem unworthy of belief. That we cannot do.

## II

█ Ennis next argues the court erred by allowing the jury to hear evidence he committed additional, uncharged, acts of sexual abuse against C. during the time they were living in Arizona. Pursuant to Evidence Code section 1108,[4] evidence of such additional incidents of sexual misconduct is admissible to demonstrate propensity, unless the evidence is determined to be unduly prejudicial or otherwise objectionable under Evidence Code section 352.[5]

---

[4] Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

[5] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

As our Supreme Court explained in *People v. Falsetta* (1999) 21 Cal.4th 903 [89 Cal.Rptr.2d 847, 986 P.2d 182], Evidence Code section 1108 requires the court to examine the evidence of other incidents of sexual misconduct, and "consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*People v. Falsetta, supra*, 21 Cal.4th at pp. 916–917.)

Ultimately, the determination of whether the probative value of such evidence is substantially outweighed by the possibility of undue consumption of time, unfair prejudice or misleading the jury is "entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence. [Citation.]" (*People v. Fitch* (1997) 55 Cal.App.4th 172, 183 [63 Cal.Rptr.2d 753].) We review the court's decision on an abuse of discretion standard. (*People v. Kipp* (1998) 18 Cal.4th 349, 371 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

Here, Ennis contends the evidence he committed additional, uncharged, acts of sexual abuse against C. in Arizona was unduly prejudicial—meaning its prejudicial effect "substantially outweighed" its probative value (Evid. Code, § 352)—primarily because it had almost no probative value.

Admittedly, the probative value seems slight. While evidence the defendant has committed other, similar, crimes is always probative due to its suggestion he has a propensity toward that type of crime, when such evidence comes in a child molestation case, from the same witnesses who supplied the evidence of the charged crimes, and amounts to evidence that the defendant molested the child even more times than he was charged with, it wouldn't seem to advance the ball in any meaningful way. None of the evidence about the alleged Arizona crimes fills in any missing pieces about what happened in California; nor, since the evidence comes from the same source as the evidence about the California crimes, does it corroborate that California evidence in any significant way.

Nonetheless, we conclude the contention that the prejudicial impact of this evidence *substantially* outweighed the probative effect is unpersuasive. Stated simply, we reject the assertion the challenged evidence about the Arizona crimes had any significant "prejudicial" effect, as that word is used in Evidence Code section 352.

■ " 'In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 320 [75 Cal.Rptr.2d 412, 956 P.2d 374], quoting *People v. Yu* (1983) 143 Cal.App.3d 358, 377 [191 Cal.Rptr. 859].) It is not enough that the proffered evidence tends to make the defendant look guilty of the crimes charged. Instead, the "prejudice" which Evidence Code section 352 seeks to avoid is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual . . . ." ' " (*People v. Gionis, supra,* 9 Cal.4th at p. 1214.) The danger to be avoided is that evidence of additional crimes might cause the jurors to want to punish the defendant for those crimes, even if they are not entirely sure he committed the one(s) at issue.

In this case, we are confident that whatever "emotional bias" the Arizona evidence might have tended to invoke against Ennis was nugatory, given the substantially identical evidence offered regarding the California crimes which were actually at issue. Nothing about the uncharged Arizona crimes made Ennis look significantly worse, or made his alleged conduct in California appear significantly more egregious, than it already did. Although Ennis claims the evidence was prejudicial because it "allowed the prosecution to introduce evidence that [he] not only molested C. at his parents' house, but molested C.'s little sister . . . who had muscular dystrophy as well . . . ," we find the contention unpersuasive. We simply reject the implication that jurors would be sanguine about a man molesting his young daughter, and would become disturbed by such conduct only if she were disabled.

Further, nothing about the Arizona evidence made the California evidence look substantially more credible than it would have otherwise. If the jury was not inclined to believe what C. had told the police about what happened to her in California (before recanting), and what K. testified to at trial about what happened to both C. and C.S. in California, it's difficult to imagine how hearing additional evidence from the same sources, about similar crimes committed against C. in Arizona, would change anything. This same point was made in *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [27 Cal.Rptr.2d 646, 867 P.2d 757]: "The testimony describing defendant's uncharged acts, however, was no stronger and no more inflammatory than the testimony concerning the charged offenses. This circumstance decreased the potential for prejudice, because it was unlikely that the jury disbelieved Jennifer's testimony regarding the charged offenses but nevertheless convicted defendant on the strength of Natalie's testimony or Jennifer's testimony regarding the uncharged offenses, or that the jury's passions were inflamed by the evidence of defendant's uncharged offenses."

In the circumstances of this case, we reject the contention the prejudicial effect of allowing the jury to hear of Ennis's uncharged acts of sexual

molestation in Arizona substantially outweighed the probative value of that evidence. The court did not err in admitting it.

### III

Ennis next contends the court erred by excluding his proffered expert testimony to the effect that "the manner in which the [police] interview [with C.] was conducted could have influenced the accuracy and reliability of her statements." The Attorney General counters the court did not actually rule on the issue, and Ennis forfeited any right to offer the evidence by failing to pursue the matter after the court indicated a tentative decision not to allow it. We agree with the Attorney General.

Ennis first suggested he could introduce this expert testimony about police interview techniques through the testimony of Dr. Laura Brodie, but later suggested he could do so through the testimony of a different expert, Dr. Jeffrey Younggren, who was also slated to testify as a defense expert about CSAAS. As Ennis's counsel expressed it, "why don't we just have one expert and not two."

The parties then argued at some length about whether such evidence should be admitted, with Ennis's counsel claiming Younggren should be allowed to testify about "the interview techniques per se generically," and the prosecutor contending both that Younggren had no significant personal experience of working with children, and that despite Younggren's willingness to testify on the subject, there were actually no accepted protocols for interviewing child sexual abuse victims.

The court indicated it was "inclined" to allow Younggren to testify about CSAAS, but was "not inclined to let [him] talk about how he thinks forensic interviews should be conducted." A few moments later, the court reiterated that "so far [it] is tentatively child abuse accommodation nonsyndrome okay, but not generic how I think kids should be interviewed."

Ennis's counsel then asked the court if he could pursue the point further the next morning, explaining his concern that he was "not artfully framing my argument." The court agreed, and confirmed that on the next day "[w]e're going to be talking about Dr. Younggren and motions to dismiss certain charges." However, the next day, Ennis apparently chose not to pursue the issue further, and limited his questioning of Younggren to other matters.

■ The Attorney General argues that because the court issued no final ruling on the admissibility of the proffered testimony about police interview techniques, and Ennis voluntarily elected not to pursue the matter further, he

forfeited any claim of error based upon the exclusion of the testimony. We agree. *People v. Holloway* (2004) 33 Cal.4th 96, 133 [14 Cal.Rptr.3d 212, 91 P.3d 164], is controlling: "A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself. [Citations.] ' " 'Where the court rejects evidence temporarily or withholds a decision as to its admissibility, the party desiring to introduce the evidence should renew his offer, or call the court's attention to the fact that a definite decision is desired.' " ' [Citation.]"

Ennis argues *Holloway* is distinguishable, because the tentative ruling in this case was "tentative" in name only, having been offered after the parties had engaged in "three extensive discussions regarding this issue." But, the distinction between a tentative ruling and a final one does not turn on whether the court has given significant consideration to the issue; it turns on whether the court has *finished* its consideration of the issue. Here, the court made clear it had not, and explicitly agreed to hear further argument on the issue the next day. It was Ennis, and not the court, who decided not to pursue the matter further, and thus it was Ennis who abandoned the issue. Having done so, Ennis cannot complain that the court erred in its ruling.

## IV

Ennis's final argument is that the prosecutor committed misconduct by making two statements in closing argument which implied the standard of proof in this case was something less than the typical beyond-a-reasonable-doubt standard applicable to all criminal cases.

The prosecutor's first challenged statement was a response to a point Ennis's own counsel had made in closing, to the effect that child molestation cases turn "the presumption of innocence on its head," since jurors are so inclined to believe the victims. Ennis's counsel claimed that if this had been any other type of criminal case, the weakness of the evidence would make it "a slam dunk vote of not guilty." The prosecutor responded by noting that even if it were true that in any other type of case, the evidence might be viewed as weak, that was immaterial, because "this is a child molestation case. Period. Perhaps he wants to be in another case, okay. But we're in this case."

The prosecutor's second challenged statement is one in which he invited the jurors to equate the "abiding conviction" necessary to constitute belief

beyond a reasonable doubt to the feeling of concern he or she might feel as a parent or grandparent if Ennis had approached their young daughter or granddaughter: "If you're at a swimming pool and your children or your granddaughter is in a Jacuzzi and you walk in and you're standing there and you see Mr. Ennis get into that Jacuzzi, do you pull your kid out? That's an abiding conviction, ladies and gentlemen."

However, as the Attorney General points out, Ennis neither objected to these statements at the time they were made, nor asked the court to admonish the jury to disregard the comments. Ennis has consequently waived the objection. "It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330]; see also *People v. Prince* (2007) 40 Cal.4th 1179, 1294 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

Ennis acknowledges he failed to object, or to request an admonition, but asserts he was excused from doing so on the ground it would have been "futile" to do so. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1333 [65 Cal.Rptr.2d 145, 939 P.2d 259] [when the defendant fails to object and request an admonition, " 'the point is reviewable only if an admonition would not have cured the harm caused by the misconduct' "].) However, Ennis fails to offer any convincing explanation as to why this alleged misconduct would not have been cured by an admonition. He simply asserts, in conclusory fashion, that in a trial where the evidence was "wildly inconsistent," the prosecutor's argument would have been all but impossible to ignore "even if an admonition had been given."

But, the success of an admonition is not measured by whether the jury would be expected to forget the improper comment entirely, but instead by whether the jury could be expected to apply the law properly despite that comment. Here, any concern that the prosecutor was giving the jury the impression that some lesser standard of proof was applicable to this case could have been cured by a simple admonition by the court that beyond a reasonable doubt meant the same thing in this case as it would mean in any other criminal case, and that an "abiding certainty" Ennis committed the crimes charged in this case is something far greater than the mere fear or suspicion that might prompt a parent to remove a child from the orbit of a suspected molester.

But having failed to object to the prosecutor's comments, and to request such an admonition, Ennis waived the claim of prosecutorial misconduct.

## DISPOSITION

The judgment is affirmed.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 2, 2011, S189663.