Filed 11/17/25  P. v. Sam CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SOEUN SAM,<br><br>    Defendant and Appellant. | B335190<br><br>(Los Angeles County<br>Super. Ct. No. NA111878) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Chestopher L. Taylor, Judge.  Affirmed.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Soeun Sam appeals from a judgment after a jury found him guilty of first degree murder. Sam argues (1) substantial evidence did not support the jury's finding of premeditation and deliberation; (2) the prosecutor mischaracterized the evidence when questioning a key witness; (3) defense counsel provided ineffective assistance of counsel by failing to object to witness testimony, discredit a witness during closing argument, and request a jury instruction on subjective provocation; and (4) the cumulative effect of the errors resulted in an unfair trial. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Evidence at Trial*

In May 2019, Sam lived in an apartment in Long Beach with his wife, Sena Khim, and a roommate, LaDavid N.[1] Sam had been in a relationship with Khim for two or three years.

On the morning of May 7, 2019, Long Beach Police Department officers went to Sam's apartment to investigate a 911 call hangup. Upon arriving, the officers spoke to Sam outside his apartment, capturing Sam's interaction with them on video. Sam told the officers to arrest him because he "killed her." When the officers asked Sam who he killed, Sam said he killed his wife, and her dead body was inside his apartment. Sam did not complain of any injuries and did not appear to have any.

The officers went inside Sam's two-bedroom apartment and saw blood stains on the floor in the living room. Behind the

---

[1] We refer to the surviving victim by his first name and last initial to protect his privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4).)

2

living room was a third makeshift bedroom cordoned off with a sheet.  In that bedroom the blankets and sheets had been pulled off the bed and piled up on the floor.  Khim's dead body was on the floor underneath the blankets and sheets.  Her head was laying on a pillow that was soaked in blood.  Khim had "a clear gaping wound on [her] forehead" and "her face looked like it had been caved in."

LaDavid was sitting on a couch in the living room.  Officers escorted him out of the apartment and took him to the police station to be interviewed.  LaDavid told Officer Perry Thach that the night before, there was an argument between his two roommates.  LaDavid also told him Sam came into LaDavid's room in the middle of the night, asking if he could sleep in there with LaDavid, but LaDavid said no.  Sam sat in a chair in the bedroom for an hour before leaving.  In the morning, Sam told LaDavid that "he beat [Khim] to death."  LaDavid asked him, " 'Why did you do it?' "  Sam said that "he was upset" with Khim.  LaDavid then told Sam, " '[I]f you hurt her or killed her, you should call police.' "

Officers recovered from Sam's apartment a wooden object and a metal bar, both of which had blood stains on them.  The wooden object looked like a table leg.  One end was wrapped in bandages, apparently to create a handle.  The metal bar was big and heavy and looked like the handle of a bolt cutter.  Testing revealed both objects had blood and Khim's DNA on them.  Officers also tested several items of Sam's clothing and swabbed his hand.  Sam's socks, pants, and shirt contained blood and Khim's DNA.  The sample from Sam's hand contained both his and Khim's DNA.

According to the medical examiner, Khim died of multiple blunt force trauma caused by objects such as "a pipe, bat, or fists." Most of her injuries were on the front of her head, chest, and left shoulder. She had lacerations and bruising on multiple areas on her head, including a large laceration on her forehead and left eyebrow. The front of her face was "flattened" and "smashed in around the nose area." She had a large fracture at the base of her skull.

LaDavid testified at trial that Khim came over every evening to eat dinner, and then she usually left (she had eight children with a former partner). The day before the police arrived, Khim and Sam were having dinner and drinking beer in the apartment. At some point, Khim left. After Khim left, Sam kept drinking and got drunk because "[h]e was depressed." LaDavid said "there was some kind of jealously going on." According to LaDavid, "Sam [was] very jealous of his wife."

Sometime "in the evening" and "before the killing," Sam and LaDavid were drinking beer when Sam asked, " 'What would you do if someone died in the residence?' " LaDavid told him "that he should call the police." LaDavid further testified that at midnight, "[b]efore the killing of that woman, [Sam] asked [LaDavid] if he could . . . share the same bed." LaDavid told Sam no because LaDavid's bed was too small.

LaDavid stated he "didn't see [Sam's] wife die." He "didn't know what was going on, what they were doing in the other room." He "didn't hear anything, not even a little sound." At some point when the police arrived in the morning, LaDavid saw Khim's dead body. When the prosecutor asked LaDavid when he became aware of the killing, LaDavid responded, "I didn't know. The police came over, and I was escorted out. That was it."

B.     *Relevant Jury Instructions and Closing Argument*

The trial court instructed the jury with the following relevant jury instructions: first or second degree murder with malice aforethought (CALCRIM No. 520), first degree murder (CALCRIM No. 521), voluntary intoxication (CALCRIM No. 3426), voluntary manslaughter: heat of passion (CALCRIM No. 570), and personal use of a deadly weapon (CALCRIM No. 3145).

Defense counsel's theory of the case was that Sam was drunk and, "enraged [with] jealousy," he killed Khim without malice aforethought.  Counsel asked the jury to find Sam guilty of manslaughter, not first or second degree murder.  During closing argument, counsel described the events as follows:  The day before the police arrived, Sam and Khim were having dinner and drinking.  Khim left, and Sam continued to drink.  At some point, Khim returned to the apartment and "a terrible fight about jealousy and rage" occurred.  As counsel stated, "That's when . . . Sam must have struck her."  Counsel asked the jury to "use common sense and logic" to find Sam was "drunk off his ass" and did not "know what [was] going on."

Counsel further argued that after the killing, Sam asked LaDavid, " 'What should I do if I killed someone?  I think she might be dead.' [LaDavid said], 'Call the cops.' "  Counsel stated, "Does it make sense [Khim] left to go somewhere and . . . Sam [said], 'Hey, what should I do if I kill someone later tonight?' That doesn't make sense.  That is nonsense."

C.	*Verdict and Sentencing*

The jury found Sam guilty of first degree murder (Pen. Code,[2] § 187, subd. (a)) and found true that he used two deadly and dangerous weapons, a wooden bat and metal bar, in the commission of the murder (§ 12022, subd. (b)(1)).  The trial court sentenced Sam to a total term of 26 years to life, consisting of 25 years to life for the murder, plus one year for one of the weapon enhancements.[3]

Sam timely appealed.

## DISCUSSION

A.	*Substantial Evidence Supported the Jury's Finding Sam Killed Khim Deliberately and with Premeditation*

Sam does not challenge the jury's finding that he killed Khim; instead, he contends substantial evidence did not support the jury's finding he killed her with deliberation and premeditation.  We reject his argument.

1.	*Applicable law and standard of review*

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."  (§ 187, subd. (a).)  "If the murder is 'willful, deliberate, and premeditated,' it is first degree murder.  [Citation.]  ' " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and

---

[2]	Statutory references are to the Penal Code unless indicated otherwise.

[3]	Although the jury found true two enhancements for using deadly and dangerous weapons during the murder, the court is only permitted to impose one.  (§ 1170.1, subd. (f).)

weighing of considerations for and against the proposed course of action." ' " [Citation.] " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*); accord, *In re Lopez* (2023) 14 Cal.5th 562, 580.)

The Supreme Court has "identified 'three basic categories' of evidence [the] court has generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason." ' " (*Morales*, *supra*, 10 Cal.5th at pp. 88-89; see *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

These categories of evidence " ' "are descriptive and neither normative nor exhaustive." ' " (*Morales*, *supra*, 10 Cal.5th at p. 89.) We " ' "need not accord them any particular weight." ' " (*Ibid*.) They provide " 'a framework to aid in appellate review,' " but they do not " 'define the elements of first degree murder or

7

alter the substantive law of murder in any way.' " (*Ibid.*; see *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 492 ["those categories or factors . . . are merely intended to guide a reviewing court's assessment of whether the evidence supports a reasonable inference that the killing was the result of the defendant's preexisting reflection and not the result of an unconsidered or rash impulse"].)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hin* (2025) 17 Cal.5th 401, 451; see *People v. Ellis* (2025) 108 Cal.App.5th 590, 596.) "In so doing, a reviewing court ' " 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*Morales*, *supra*, 10 Cal.5th at p. 88; see *Ellis*, at p. 596.) "Substantial evidence also ' "includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) " ' " '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.)

2.     *Analysis*

The record contains at least two of the three " 'basic categories' of evidence" that generally support an inference of

8

premeditation and deliberation: planning activity and motive. (*Morales*, *supra*, 10 Cal.5th at p. 88.) Substantial evidence supported the jury's finding the killing was premeditated and deliberated. (See *People v. Romero* (2008) 44 Cal.4th 386, 401 ["A first degree murder conviction will be upheld when . . . there is evidence of motive with evidence of either planning or manner" of killing].)

First, a jury could draw a reasonable inference from the evidence that prior to the murder, Sam engaged in activity intended to result in Khim's murder. According to LaDavid's testimony at trial, before the killing, Sam asked him, " 'What would you do if someone died in the residence?' " The jury could reasonably infer from this question that Sam contemplated killing Khim. (See *People v. Felix* (2009) 172 Cal.App.4th 1618, 1626 ["preoffense words from the perpetrator's own mouth," including "verbal expressions of malice made so close in time to the shooting" showed premeditation].) Further, one of the weapons Sam used, a wooden table leg, had been wrapped with bandages to create a handle. The fact that Sam appeared to have prepared the weapon beforehand supports an inference that Sam did not pick it up on a "spur-of-the moment impulse." (*Morales*, *supra*, 10 Cal.5th at p. 90 [defendant's use of gloves and three different knives to kill victim supported inference that he did not spontaneously pick up the tools but instead arrived at the home prepared to attack].)

Second, the evidence demonstrates that Sam was "very jealous" when it came to Khim, and the pair had recently quarreled. Sam admitted he beat Khim to death because he was "upset with her." Sam's apparent displeasure over the state of his relationship with Khim is evidence of a motive for the

9

murder. (See *People v. Williams* (2018) 23 Cal.App.5th 396, 410 [defendant's "rage at the collapse of [his] marriage" provided evidence of motive to kill his wife]; *People v. Disa* (2016) 1 Cal.App.5th 654, 666 [motive for killing shown by evidence defendant was jealous of victim's relationship with another]; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 893 ["evidence showing 'quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense' "].)

Sam challenges LaDavid's testimony that, "before the killing," Sam asked, " 'What would you do if someone died in the residence?' " Sam claims the testimony is "inherently improbable, physically impossible, and unreasonable" and thus must be rejected.

As our Supreme Court "ha[s] explained: 'We are skeptical of the claim that the testimony of an ordinary witness who claims to have heard the confession or damaging admission of a criminal defendant may be excluded from evidence on the ground that it is inherently improbable. Generally, "doubts about the credibility of [an] in-court witness should be left for the jury's resolution." ' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 996; see *People v. Brown* (2014) 59 Cal.4th 86, 104-105.) "While an appellate court can overturn a judgment when it concludes the evidence supporting it was 'inherently improbable,' such a finding is so rare as to be almost nonexistent. ' "To warrant the rejection of the statements given by a witness who has been believed by a trial court [or a jury], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728-729.)

Here, LaDavid's testimony is not demonstrably false or physically impossible.  LaDavid testified he observed Khim come to the apartment for dinner and drinks, and then leave, as was consistent with Khim's routine.  LaDavid remained with Sam, and it was during this period—after Khim had left and before LaDavid saw Khim's dead body the next day—that Sam asked the incriminating question.

Sam argues it is not possible for LaDavid to testify about the "timing" of Sam's question because LaDavid did not see Khim return to the apartment and did not see or hear the murder occur.  But the fact that LaDavid did not observe those events does not render his testimony impossible.  There were multiple rooms in the apartment, and it is possible that after Sam asked his incriminating question, Khim returned to the apartment and was murdered while LaDavid was alone in a bedroom or asleep, unable to observe those events.  (See *People v. Ennis*, *supra*, 190 Cal.App.4th at p. 729 [the only inquiry is whether "it seem[s] *possible* that what the witness claimed to have happened actually happened"].)  The fact that LaDavid's testimony is open to other possibilities is immaterial.  (See *People v. Mumin* (2023) 15 Cal.5th 176, 202 [" 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' "].)

Sam also argues that absent LaDavid's "timing testimony" there is insufficient evidence of premeditation and deliberation.  He points to individual pieces of evidence in the record, considers them in a light favorable to him, and argues there is no evidence of premeditation and deliberation.  But the test is whether, after

11

viewing all the evidence " 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715, italics omitted.) Based on the evidence, we cannot say no rational trier of fact could find beyond a reasonable doubt that the murder of Khim was premeditated and deliberate.

B.      *The Prosecutor Did Not Commit Prejudicial Misconduct*

Sam argues the prosecutor committed prejudicial misconduct by improperly "mischaracteriz[ing] LaDavid's testimony" during the direct examination of LaDavid.  We are not persuaded.

1.      *Relevant testimony*

The following exchange took place during LaDavid's testimony on direct examination:

"[Prosecutor]:  [D]id you tell police that . . . Sam told you that he had beaten his girlfriend to death?

[LaDavid]:  No, I don't think I did.

. . .

[Prosecutor]:  Did you tell the police [that] Sam told you that he did it because he was very upset with her?

[LaDavid]:  Oh, I know a little bit on that. . . .  [Sam] asked me in the evening, he asked me earlier, 'What

12

if someone died,' and what could be done about it?  So
I told him, 'Are you crazy?  If someone died some
place, the police has to be called.'

. . .

[Prosecutor]:  You said [Sam] talked to you about
what would happen if he killed someone[?]

[Defense Counsel]:  I'm going to object.  That
misstates the evidence.

[Court]:  Overruled.  You may answer.

[LaDavid]:  If someone has died in the . . . residence."
2.　　*Analysis*
Sam contends the prosecutor mischaracterized the evidence
when he asked during LaDavid's direct examination, "You said
[Sam] talked to you about what would happen if he killed
someone[?]"  Sam argues that, contrary to the prosecutor's
question, LaDavid "clearly testified that [Sam] asked what to do
'if someone died,' not if he killed someone, and certainly not if he
were to kill someone."  Even assuming the prosecutor
mischaracterized the evidence in the ways Sam alleges—by
suggesting that Sam admitted to killing someone or that Sam
contemplated killing someone in the future—Sam has failed to
demonstrate prejudice.

"Although prosecutors have wide latitude to draw
inferences from the evidence presented at trial, mischaracterizing
the evidence is misconduct.  [Citation.]  A prosecutor's 'vigorous'

13

presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' " (*People v. Hill* (1998) 17 Cal.4th 800, 823; see *People v. Cash* (2002) 28 Cal.4th 703, 732 ["Counsel may not state . . . facts . . . that are not in evidence."].)  However, "[e]ven where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564 (*Fernandez*).)

"Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18, to the extent federal constitutional rights are implicated, and *People v. Watson* (1956) 46 Cal.2d 818, [ ] if only state law issues were involved." (*Fernandez, supra*, 216 Cal.App.4th at p. 564; accord, *People v. Adanandus* (2007) 157 Cal.App.4th 496, 514.)  *Watson* applies if the prosecutor's misconduct involves " ' " 'deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215; see *Fernandez*, at p. 564; *Adanandus*, at pp. 514-515.)  *Chapman* applies if the prosecutor's conduct " 'comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*Gionis*, at pp. 1214-1215; see *Fernandez*, at p. 564; *Adanandus*, at p. 514.)

The alleged misconduct did not render the trial so fundamentally unfair that it triggered the *Chapman* standard, and the alleged misconduct was harmless under the *Watson* standard because it is not reasonably probable that a more favorable result would have been reached absent the alleged objectionable question.  The prosecutor's question was brief and isolated.  (See *People v. Arias* (1996) 13 Cal.4th 92, 161 [no prejudice where prosecutor's improper comments "were relatively

14

brief and were not repeated"].)  And the trial judge instructed the jury with CALCRIM No. 222, which stated in relevant part: "Nothing that the attorneys say is true is evidence. . . .  Their questions are not evidence.  Only the witnesses' answers are evidence. . . .  Do not assume that something is true just because one of the attorneys asked a question that suggested it was true."  We presume that the jury followed its instructions and did not consider the prosecutor's question as evidence.  (See *People v. Chhoun* (2021) 11 Cal.5th 1, 30.)

Moreover, it was obvious and undisputed that Sam killed Khim.  (See *People v. Arias*, *supra*, 13 Cal.4th at p. 161 ["Even if the prosecutor's remarks had been improper, we would find no basis for reversal" because "the violence of the two incidents . . . was already obvious"].)  Indeed, the jury watched a video of Sam telling police officers that he "killed her."  Officer Thach testified that LaDavid said that Sam admitted "he beat [Khim] to death."  And, defense counsel conceded during closing that Sam killed Khim.

Similarly, any improper suggestion that Sam contemplated killing someone in the future was harmless because that fact was later introduced during the trial.  (See *People v. Johnson* (2019) 8 Cal.5th 475, 518 [any error in admitting evidence was harmless because similar evidence was properly admitted].)  LaDavid later testified that "*before the killing*," Sam "asked [him], 'What would you do if someone died in the residence?' "  (Italics added.)  LaDavid even reiterated a second time during his testimony that Sam's question occurred "before the killing."  Accordingly, no prejudice occurred.

C.    *Defense Counsel Did Not Provide Ineffective Assistance*

Sam contends his counsel was ineffective for failing to (1) object to a portion of LaDavid's testimony, (2) argue during closing that a portion of LaDavid's testimony should have been rejected, and (3) request an instruction on CALCRIM No. 522. We reject these contentions.

1.    *Applicable legal principles*

" ' "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.  [Citation.]  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Rices* (2017) 4 Cal.5th 49, 80; accord, *People v. Johnson* (2016) 62 Cal.4th 600, 653; *In re Roberts* (2003) 29 Cal.4th 726, 744-745; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citations.]  '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926; accord, *People v. Ledesma* (2006) 39 Cal.4th 641, 746.)  Accordingly, to prevail on direct appeal on a claim that counsel's performance fell below an objective

16

standard of reasonableness, a defendant must show "counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " ' " '[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." ' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)

2.      *Counsel's failure to object to LaDavid's testimony*

Sam argues his defense counsel should have objected to LaDavid's testimony that "before the killing," Sam asked, " 'What would you do if someone died in the residence?' " Sam contends, more specifically, that LaDavid's testimony about the *timing* of Sam's question, i.e., that it occurred "before the killing," "lacks any foundation and is based purely on speculation" because LaDavid did not know when the murder took place. Sam relies on the principle that "[a] question that ' "ask[s] a lay witness to testify to facts that the witness has not personally observed, or to state an opinion not based on his or her own observations, calls for speculation and conjecture." ' " (*People v. Walts* (2025) 112 Cal.App.5th 127, 137.)

"[C]ounsel's decision whether or not to object to inadmissible evidence is a matter of trial tactics. [Citation.] Because we accord great deference to trial counsel's tactical decisions, counsel's failure to object rarely provides a basis for finding incompetence of counsel." (*People v. Lewis* (2001) 25 Cal.4th 610, 661; see *People v. Aguirre* (2025) 18 Cal.5th 629, 707 [" ' "a mere failure to object to evidence . . . seldom establishes counsel's incompetence" ' "].) " 'Representation does not become deficient for failing to make meritless objections'

[citation], and there may be valid reasons why counsel may choose not to make even a meritorious objection." (*Aguirre*, at p. 707.)

Here, defense counsel's representation was not deficient because any objection would have been meritless. LaDavid's testimony about the timing of Sam's question was not pure speculation; it was based on his personal knowledge of the events leading to the murder. (See Evid. Code, §§ 702, 800 [a lay witness may testify to facts based on his or her personal observations].)

As noted, LaDavid saw Khim leave the apartment after having dinner with Sam. While LaDavid was alone with Sam, Sam asked the incriminating question. Based on his personal observations of Khim and Sam, LaDavid reasonably concluded that Sam asked the question *before* the murder occurred. LaDavid did not merely guess as to the timing of Sam's question; rather, he placed the question in a timeline of observed conduct.

Sam contends the testimony is speculative because LaDavid did not know when Khim returned to the apartment and when exactly the murder occurred. But the fact that LaDavid did not observe these events does not render his testimony speculative. A witness is not required to observe every moment of an event to offer testimony about it. (See *People v. Walts*, *supra*, 112 Cal.App.5th at pp. 137-138 [although witness did not observe her spouse purchase clothes for their daughter, it was not speculative for witness to testify as to that fact because witness had personal knowledge of the family's general shopping habits].) Because LaDavid observed other key events and was able to draw reasonable inferences from those events, his testimony was not pure conjecture. Defense counsel's failure to object to this portion

of LaDavid's testimony did not constitute ineffective assistance of counsel.

### 3. *Counsel's failure to argue during closing argument that LaDavid's testimony should be rejected*

Sam argues that defense counsel's closing argument was deficient because he failed to sufficiently discredit LaDavid's testimony that "before the killing," Sam asked, " 'What would you do if someone died in the residence?' " Sam contends that defense counsel did not adequately attack the "timing" of Sam's alleged question.

The presumption that counsel engaged in a sound trial strategy "appl[ies] with particular force at closing argument" because " '[t]he decision of how to argue to the jury after the presentation of evidence is inherently tactical.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 391; accord, *People v. Samayoa* (1997) 15 Cal.4th 795, 856.) Given this presumption, we cannot conclude defense counsel's closing argument was deficient. Counsel, in fact, implicitly discredited LaDavid's testimony regarding the timing of Sam's question. Counsel argued, "Does it make sense [Khim] left to go somewhere and . . . Sam [said], 'Hey, what should I do if I kill someone later tonight?' That doesn't make sense. That is nonsense. You have to use common sense and logic." Counsel later argued that "there is absolutely no evidence that [Sam] decided to kill before completing the acts."

Sam acknowledges that "defense counsel attempted to attack [LaDavid's] timing testimony," but argues that counsel should have spent more time on the issue and buttressed his argument with more points. While counsel's argument regarding LaDavid's specific testimony was brief, it "was not so lacking as to fall below the constitutional minimum." (*People v. Gamache*,

19

*supra*, 48 Cal.4th at p. 394 [rejecting defendant's contention that defense counsel's argument was overly brief and superficial]; see *People v. Cudjo* (1993) 6 Cal.4th 585, 634-635 ["The effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality."]; *People v. Moore* (1988) 201 Cal.App.3d 51, 57 ["Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense."].) Accordingly, Sam failed to establish defense counsel provided ineffective representation during closing argument.

4. *Counsel's failure to request CALCRIM No. 522*

Sam acknowledges that defense counsel did not request a jury instruction on subjective provocation under CALCRIM No. 522.[4] He also acknowledges that the trial court did not have a sua sponte duty to instruct the jurors on CALCRIM No. 522 absent a request from counsel. (See *People v. Rivera* (2019) 7 Cal.5th 306, 328-329 [trial court is not required to give instruction sua sponte that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation, such as CALCRIM No. 522]; accord, *People v. Rogers* (2006) 39 Cal.4th 826, 877-880 (*Rogers*).) Anticipating forfeiture, he argues defense counsel was ineffective for failing to request a pinpoint

---

[4]    CALCRIM No. 522 provides, in relevant part: "Provocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

20

instruction on CALCRIM No. 522 because "[t]here could be no rational tactical reason for counsel's failure" and "the lack of the instruction was prejudicial." His argument is without merit.

Sam has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland v. Washington, supra,* 466 U.S. at p. 689.) Defense counsel's main theory of the case was that Sam was guilty of voluntary manslaughter and not guilty of first or second degree murder. Defense counsel argued the murder should be reduced to voluntary manslaughter based either on a theory of voluntary intoxication (CALCRIM No. 3426)[5] or heat of passion due to provocation (CALCRIM No. 570).[6]

---

[5] As given to the jury, CALCRIM No. 3426 stated, in relevant part: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with malice aforethought. . . . [¶] In connection with the charge of murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted with malice aforethought. If the People have not met this burden, you must find the defendant not guilty of murder."

[6] The jury was instructed with CALCRIM No. 570 that "[a] killing that would be murder is reduced to voluntary manslaughter if they killed someone because of a sudden quarrel or heat of passion. The defendant killed someone because of a sudden quarrel or heat of passion if, one, the defendant was provoked; two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

21

Additional jury instructions on provocation as a basis for second degree murder under CALCRIM No. 522 would have focused the jury's attention on using the provocation theory to reach a verdict of second degree murder instead of a verdict of voluntary manslaughter. It is possible defense counsel wanted the jury to choose only between first degree murder and voluntary manslaughter, when applying the provocation theory, and did not want the jury to have the option of finding the defendant guilty of second degree murder. Compared to second degree murder, which is punishable by imprisonment for 15 years to life (§ 190, subd. (a)), voluntary manslaughter is punishable by imprisonment for three, six, or 11 years (§ 193, subd. (a)). Because voluntary manslaughter carries a lower sentence, it could have been a tactical decision for defense counsel to focus the jury's attention on voluntary manslaughter, instead of second degree murder. (Cf. *People v. Thomas* (1992) 2 Cal.4th 489, 531-532 [defense counsel's "[f]ailure to argue an alternative theory is not objectively unreasonable as a matter of law. . . . That the two [possible defense theories] are not absolutely incompatible does not vitiate a choice to [argue] one or the other"].)

D.    *Cumulative Effect of the Errors*

Sam argues the cumulative effect of the claimed errors was prejudicial and deprived him of a fair trial. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) "To the extent that there are a few instances in which we found or assumed the existence of error, we concluded that no prejudice resulted. We reach the same

conclusion after considering the errors' cumulative effect." (*People v. Booker* (2011) 51 Cal.4th 141, 195.)

## DISPOSITION

The judgment is affirmed.

STONE, J.

We concur:

MARTINEZ, P. J.

FEUER, J.